**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,
Plaintiff,**

**and**

**Margaret Schnoop, Elizabeth Flores, and Erin Blair, Intervening Plaintiffs,**

**v.**

**ROTARY CORPORATION, Keith Barry, and Alan Makarwich, Defendants.**

No. 00–CV–1478.

United States District Court, N.D. New York.

Dec. 29, 2003.

Equal Employment Opportunity Commission, New York City, Louis Graziano, of Counsel, for Plaintiff.

Delorenzo, Pasquariello & Weiskopf, Schenectady, NY, Thomas DeLorenzo, Kathleen M. Kiley, of Counsel, Attorneys for Intervening Plaintiffs.

Robert S. Catapano–Friedman, P.C., Albany, NY, R. Catapano–Friedman, Of Counsel, Attorney for Defendant Rotary Corporation.

John T. Casey, Jr., Albany, NY, for Defendant Alan Makarwich.

Sanford Soffer, Albany, NY, Attorney for Defendant Keith Barry.

## MEMORANDUM–DECISION and ORDER

HURD, District Judge.

### TABLE OF CONTENTS

I. INTRODUCTION ........................................................... 649

II. FACTUAL BACKGROUND ................................................ 649

 A. *Defendants* .......................................................... 649

 B. *Flores and Blair* .................................................... 649

 C. *Schnoop* ............................................................ 650

III. DISCUSSION ............................................................ 651

 A. *Summary Judgment Standard* ...................................... 651

 B. *Claims at Issue* ..................................................... 652

 C. *Timeliness of Flores's and Blair's Title VII Claims* .............. 652
 1. *Standards* ...................................................... 652
 2. *Referral to/receipt by the DHR* ............................... 654
 3. *Failure to direct the EEOC to file with the DHR* ............. 656
 4. *Failure to submit actual 1999 worksharing agreement* ........ 657
 5. *Conclusion* ..................................................... 659
 6. *Application of 300–day filing period* ......................... 659

 D. *Flores's National Origin and Schnoop's Sexual Harassment Claims* ........ 660
 1. *Discrimination standards* ..................................... 660
 2. *National origin—Flores* ...................................... 660
 3. *Sexual harassment—Schnoop* ................................ 661
 a. *Plaintiff's acts* ........................................... 661
 b. *Liability of Rotary* ...................................... 662
 i. Employer standards ................................ 662
 ii. Barry was Schnoop's supervisor ................... 663
 iii. Tangible employment action ....................... 663
 iv. Faragher/Ellerth affirmative defense .............. 664

 E. *New York State Human Rights Law* ............................... 665
 1. *Introduction* ................................................... 665
 2. *Rotary* ......................................................... 665
 3. *Individual defendants* ......................................... 666

IV. CONCLUSION ........................................................... 667

## I. INTRODUCTION

On September 28, 2000, plaintiff Equal Employment Opportunity Commission ("EEOC") filed suit against defendant Rotary Corporation ("Rotary"), alleging certain employees of the company had sexually harassed Erin Blair ("Blair"), Elizabeth Flores ("Flores"), and Margaret Schnoop ("Schnoop"); that Flores had been the subject of a hostile work environment based on her national origin; and that the company had failed to make efforts to prevent or correct the actions of its employees, all in violation of Title VII of the Civil Rights Act of 1964 and Title I of the Civil Rights Act of 1991. On January 16, 2001, Schnoop filed an intervening complaint, alleging Title VII and New York Human Rights Law ("NYHRL") claims of sexual harassment against Rotary and Rotary employee defendant Keith Barry ("Barry").[1] On October 26, 2001, Flores and Blair filed an intervening complaint against Rotary, Barry, and Rotary employee defendant Alan Makarwich ("Makarwich"), alleging they were both subjected to sexual harassment, and that Flores was subjected to a hostile work environment based on her national origin, in violation of Title VII and the NYHRL.

Each defendant filed a motion for summary judgment pursuant to Fed.R.Civ.P. 56, seeking to dismiss all of the claims alleged against it or him. The EEOC, and Schnoop, Flores, and Blair filed opposition papers to the motions. Oral argument was heard on September 26, 2003, in Albany, New York. Decision was reserved.

1. On August 10, 2001, Schnoop's Title VII claim against Barry was dismissed. (Docket No. 46.)

2. Because no defendant moves for summary judgment on the substantive merits of Flores's or Blair's sexual harassment claims, the laun-

## II. FACTUAL BACKGROUND

### A. Defendants

Rotary is a Georgia-based business involved in the manufacture and distribution of replacement parts for the lawn and garden industry. It has a distribution warehouse in Guilderland, New York (near Albany, New York), of which Barry was the manager at all times relevant to this case. Makarwich also worked at the warehouse as a packer, though the parties dispute whether he was Flores's and Blair's supervisor or simply their co-employee. Barry's immediate supervisor was Rotary Vice President Donald Fountain ("Fountain"), who worked out of the company's Georgia headquarters.

Though the company had no formal written sexual harassment policy at the times relevant to this case, it is alleged that in the company break room hung a sign that read, "Sexual Harassment will not be tolerated, but it will be graded." (Docket No. 51, ¶¶ 28, 81; Docket No. 1, ¶ 7(a); Docket No. 4, Ex. C, ¶ 44.)

### B. Flores and Blair

Flores worked for Rotary as a picker from December 29, 1997, until July 17, 1998. Blair worked for Rotary as a picker from December of 1996, until June 12, 1998. Both claim that from the beginning of their tenures they were subjected to a sexually charged, hostile work environment by Makarwich and Barry.[2] Flores also claims that, on two separate occasions, Makarwich referred to her as a "wetback." (Docket No. 51, ¶¶ 47–48.) Both claim

dry list of allegations against Makarwich and Barry need not be detailed. Suffice it to say the allegations are many, serious, and very disturbing. Some can be found at Docket No. 51, ¶¶ 20, 22–27, 34, 45, 72–75, 77, 79–80.

that they made Barry aware of the alleged discriminatory treatment on a regular basis, but that he did nothing or participated in the complained of treatment.

On June 12, 1998, Blair alleges she was constructively discharged by Rotary. Just under a month later, on July 10, 1998, the last date on which she claims to have been harassed, Flores and her mother contacted Fountain in Georgia to complain about the alleged harassment.

Three days later, on July 13, 1998, Flores was asked by Rotary Human Resources Manager Saralyn Tootle ("Tootle") to submit in writing all of the harassment she had allegedly experienced. Because Flores stated Blair was a witness to some of the allegedly harassing events, Blair was also asked to submit a written statement. Neither complied with the request. That same day, Fountain contacted Barry by telephone, who denied Flores's allegations of sexual harassment, but did admit that Makarwich on one occasion called her an inappropriate name, for which he was reprimanded verbally and in writing. This appears to be the extent of the company's investigation into Flores's allegations. On July 17, 1998, after allegedly being unable to "stand the working environment [to which] she was subjected," Flores ceased her employment with Rotary. *Id.* at ¶ 36. A few months later, in September of 1998, Fountain and Tootle met with the warehouse employees.

On January 14, 1999, Flores filed with the EEOC an administrative complaint dated November 28, 1998, in which she alleged to be the victim of discrimination on the basis of sex and national origin. (Docket No. 42, Ex. A.) She did not indicate her desire that the complaint be filed with the New York State Division of Human Rights ("DHR"), despite the presence of a blank permitting the same. *Id.*

The next day, on January 15, 1999, Blair filed with the EEOC an administrative complaint dated January 8, 1999, alleging she had been the victim of sexual harassment. *Id.,* Ex. C. Like Flores, she left blank the space where the complainant could indicate whether he or she wished that the charge also be filed with the DHR. *Id.*

The two amended their complaints, on February 16, 1999, and March 26, 1999, respectively, this time affirmatively indicating their desire to have the charges filed with the DHR as well. *Id.,* Exs. A and C. On April 12, 2000, the EEOC issued its determination, finding all of Flores's and Blair's claims to have merit. *Id.,* Exs. B and D.

### C. Schnoop

Schnoop was hired by Rotary as a picker on July 22, 1998. From the beginning of her employment, she claims that Barry "started to make [her] feel very uncomfortable because he indicated that he was interested in her sexually." (Docket No. 4, ¶ 16.) She alleges that, in general, he expressed that interest through "numerous forced physical advances" and communication of unwelcome sexual comments, stories, and innuendo. *Id.* She also alleges that she was "forced to view sexual acts between Mr. Barry and other female employees, numerous pictures, drawings, movies, and other pornographic paraphernalia." *Id.*

As noted above, in September of 1998, a few months after first learning of Flores's complaints, Fountain and Tootle traveled to the Guilderland distribution warehouse and met with the employees, including Schnoop. At the meeting, Fountain orally addressed the topic of harassment in the workplace, though the parties disagree about the depth of attention given and what was said. Defendants claim Foun-

tain instructed the employees to contact him if they felt they were being harassed in any way.

Schnoop alleges to have been the victim of a sexually hostile work environment both before and after the September 1998 meeting, but admits not calling Fountain about any of the alleged harassment. Rotary apparently admits, at least for the purposes of the pending motions, "that Keith Barry made in [it's] judgment inappropriate sexual overtures to Ms. Schnoop," including asking her to have sexual relations with him and his secretary, and asking her to engage in anal sex with him, (Docket Nos. 91 and 98, ¶¶ 52–53). Accordingly, it is neither necessary nor desirable to outline the litany of specific instances of sexual harassment allegedly suffered by Schnoop throughout her employment.[3]

Rotary claims that any sexual conduct or activity directed or solicited from Schnoop was welcomed by her. Specifically, the company claims she dressed provocatively at work, engaged in consensual oral sex with her boyfriend on company premises, and revealed her breasts to Barry at a company picnic. It also claims that in December of 1998, after the alleged last act of harassment by Barry, Schnoop and her boyfriend accompanied Barry and his wife on a social outing to the Turning Stone Casino.[4]

Schnoop alleges that she quit her job with Rotary on December 15, 1998 "because she could not stand the working environment [to which] she was subjected." (Docket No. 4, Ex. C, ¶ 35.) On March 1, 1999, she filed an administrative complaint with the EEOC, alleging she had been subjected to a sexually offensive work environment. (Docket No. 4; Ex. A.) Contrary to the original complaints of Flores and Blair, Schnoop did affirmatively indicate her desire that the complaint be filed with the DHR. *Id.* On April 12, 2000, the EEOC issued a determination finding her claim to have merit. *Id.,* Ex. B.

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment must be granted when the pleadings, depositions, answers to interrogatories, admissions and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Richardson v. New York State Dep't of Correctional Serv.,* 180 F.3d 426, 436 (2d Cir.1999). Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Richardson,* 180 F.3d at 436; *Project Release v. Prevost,* 722 F.2d 960, 968 (2d Cir.1983). Once the moving party has met the initial burden of demonstrating the absence of a genuine issue of material fact, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56; *Liberty Lobby, Inc.,* 477 U.S. at 250, 106 S.Ct. 2505; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348. At that point the nonmoving

---

3. Suffice it to say that the allegations are many, serious, and very disturbing. *See* Docket No. 4, Ex. C, ¶¶ 17–35.

4. To be fair to Schnoop, the last act of harassment she alleges was a proposition to engage in sexual activity, made by Barry and his secretary (not his wife), to Schnoop and her boyfriend. (Docket No. 4, Ex. C, ¶¶ 31–33.)

party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, 106 S.Ct. 1348. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant. *Liberty Lobby, Inc.*, 477 U.S. at 248–49, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348.

### B. Claims at Issue

Before analyzing the pending motions, it is helpful to outline which claims are at issue. As noted, Flores, Blair, and Schnoop all allege they were victims of a sexually hostile work environment in violation of Title VII and the NYHRL. Flores also alleges that she was subject to a hostile work environment on the basis of her national origin in violation of Title VII and the NYHRL. With regards to Flores's and Blair's Title VII claims, defendants move for summary judgment on the basis that such claims are not timely. With regards to Flores's national origin discrimination claims, and Schnoop's sexual harassment claims, defendants move for summary judgment on the merits. With regards to all of the NYHRL claims, Rotary moves for summary judgment on the grounds that liability cannot be imputed to it because it never condoned or approved of any discriminatory conduct, and Barry and Makarwich move for the same on the grounds that neither can be held liable as an individual. All of these purported bases for liability will be discussed.

### C. Timeliness of Flores's and Blair's Title VII Claims

#### 1. Standards

Defendants argue that they are entitled to summary judgment on Flores's and Blair's claims under Title VII because both filed administrative charges with the EEOC more than 180 days after the complained of acts. *See Pikulin v. City Univ. of N.Y.*, 176 F.3d 598, 599 (2d Cir.1999) (filing with EEOC is statutory prerequisite to maintaining Title VII claim in federal district court). "As a general rule, a complainant must file a discrimination charge with the EEOC within 180 days of the occurrence of the alleged unlawful employment practice." *E.E.O.C. v. Commercial Office Prod. Co.*, 486 U.S. 107, 110, 108 S.Ct. 1666, 100 L.Ed.2d 96 (1988) (citing 42 U.S.C. § 2000e–5(e)). Though Flores and Blair both claimed in the intervening complaint that they did so file administrative charges within 180 days of "some of the occurrences of which [they] complain," (Docket No. 51, ¶ 11), they now admit that this is not the case, (Docket Nos. 87 and 91, ¶¶ 10, 12, 13, 17, 23.) Therefore, if the 180–day filing period applies, Flores's and Blair's Title VII claims would be time-barred.[5]

■■■ However, because New York "ha[s] an agency with the authority to

---

**5.** Though the administrative complaint Flores filed with the EEOC is dated November 28, 1998, it was not filed until January 14, 1999. (Docket No. 42, Ex. A.) She alleges that the latest date discrimination against her took place was "in July of 1998." (Docket No. 51, ¶¶ 36, 57; Docket No. 42, Ex. A.) Flores admits that the last date of alleged harassment occurred on July 10, 1998, seven days before her employment with Rotary officially ended. (Docket Nos. 87 and 91, ¶ 16.) There are 188 days in between July 10, 1998, and January 14, 1999. With respect to Blair, though the administrative complaint she filed with the EEOC is dated January 8, 1999, it was not actually filed until January 15, 1999. (Docket No. 42, Ex. C.) She alleges that she was sexually harassed "until her constructive discharge in June of 1998." (Docket No. 51, ¶ 71.) She ceased working for Rotary on June 12, 1998. There are 217 days between June 12, 1998, and January 15, 1999.

address charges of discriminatory employment practices, the statute of limitations for filing a charge of discrimination with the EEOC is [extended to] 300 days." *Butts v. City of N.Y. Dep't of Hous. Pres. and Dev.*, 990 F.2d 1397, 1401 (2d Cir. 1993). To receive the benefit of the longer filing period, plaintiffs must merely demonstrate that they "initially instituted proceedings" with the DHR. *See Ford v. Bernard Fineson Dev. Ctr.*, 81 F.3d 304, 307 n. 6 (2d Cir.1996). Whether Flores and Blair are entitled to the 300–day filing period for their claims will turn entirely on this issue.

Significantly impacting the answer to this question is the presence of a "worksharing agreement" between the EEOC and DHR that was in effect at the time Flores and Blair filed their administrative charges. *See* 29 C.F.R. § 1626.10(a) (permitting the EEOC to enter into written agreements with state or local agencies to further cooperation in the processing of discrimination charges that could be filed with either agency). The worksharing agreement submitted by plaintiffs provides that "the EEOC and the [DHR] each designate the other as its agent for the purpose of receiving and drafting charges." (Docket No. 93, 2001 Worksharing Agreement (attached), Section II(A)). It also provides that "[t]he [DHR] waives its rights of exclusive jurisdiction to initially process all charges for a period of 60 days ... to allow the EEOC to proceed immediately with the processing of charges originally received by the EEOC and charges to be initially processed by the EEOC prior to the expiration of 61 days[.]" *Id.*, Section III(A).

The Second Circuit, relying upon virtually identical worksharing agreement language, has held, "however paradoxical it may seem," that a plaintiff who originally files with the EEOC is nonetheless deemed to have "initially instituted" state proceedings with the DHR, thereby gaining entitlement to the extended 300–day filing period. *See Tewksbury v. Ottaway Newspapers*, 192 F.3d 322, 325–28 (2d Cir. 1999). And, because the worksharing agreement at issue provided that each agency is designated as the agent of the other for the purposes of receiving charges, the state proceeding "formally began and ended upon the EEOC's receipt of the charge but before [the plaintiff's] charge could be deemed as filed with the EEOC." *Id.* at 327. The court found this to be "consistent with the EEOC's interpretation"—which "regards a charge filed as 'timely' when it is received within 300 days of the alleged discriminatory act, forwarded to [a state or local agency pursuant to a worksharing agreement], and the ... agency has waived its rights to the 60–day exclusive jurisdiction period," *id.*—as well as "with the approach taken by every other circuit that has addressed the same or a similar issue concerning the ... sequential filing requirement." *Id.*

The terms of the submitted worksharing agreement expressly embody the effect of this decision. Particularly, the agreement states that the "EEOC's receipt of charges on the [DHR's] behalf will automatically initiate the proceedings of both [agencies] for the purposes of ... Title VII's [filing requirements]." (Docket No. 93, Fiscal Year 2001 Worksharing Agreement (attached), Section II(A)). This view—that filing with the EEOC "automatically" initiates proceedings with the state agency where a worksharing agreement is in effect—aside from drawing on the holding in *Tewksbury*, has been explicitly endorsed by cases both inside and outside the Second Circuit. *See Cooper v. Wyeth Ayerst Lederle*, 34 F.Supp.2d 197, 200 (S.D.N.Y. 1999) ("Under the Worksharing Agreement, ... a charge filed with one agency is automatically filed with the other"); *Feld-*

*man v. N.Y. Blood Ctr., Inc.*, available at 2002 WL 31769700, at *5 (S.D.N.Y. Dec.11, 2002) (charge filed with DHR is "automatically deemed filed" with EEOC); *Griffin v. City of Dallas*, 26 F.3d 610, 612–13 (5th Cir.1994), *cited with approval in Tewksbury*, 192 F.3d at 328; *Seery v. Biogen, Inc.*, 203 F.Supp.2d 35, 44 (D.Mass.2002) (holding that filing charge with EEOC "automatically initiated proceedings at both the EEOC and the [state agency]," despite plaintiff's failure to indicate desire for dual filing on EEOC form). In effect, these courts hold that, where there are provisions of a worksharing agreement like the one submitted here, "upon the EEOC's receipt of [a] complaint, the [state agency], for all legal and practical purposes, received the complaint." *Griffin*, 26 F.3d at 612–13. Thus, it would appear that the worksharing agreement submitted in this case would entitle Flores and Blair to the 300–day filing period.

Three hurdles—neither present nor directly addressed in *Tewksbury*—stand in the way of a ruling that Flores and Blair are entitled to the 300–day filing period. First, no definitive evidence has been submitted that demonstrates that the EEOC actually referred the charges to the DHR, or that the DHR actually received the charges. Second, on their original EEOC charges, neither Flores nor Blair indicated in any way a desire or intent that the EEOC file their charges with the DHR. Finally, though a copy of the 2001 worksharing agreement has been submitted as evidence, the actual worksharing agreement in effect at the time Flores and Blair filed their charges with the EEOC has not. Because Flores and Blair can overcome all three of these hurdles, they are entitled to the 300–day filing period.

### 2. *Referral to/receipt by the DHR*

As noted, absolutely no definitive evidence has been submitted that the EEOC in this case actually transmitted the charges to the DHR. Though affidavits have been submitted attesting that, pursuant to a worksharing agreement, it is the usual practice of the two bodies that a complaint filed with one is transmitted to the other, no affiant has claimed that the EEOC actually transmitted Flores's and/or Blair's charge, or that the DHR actually received Flores's and/or Blair's charge.

Some courts have required proof that a charge filed with the EEOC was actually transmitted to the state agency before dual-filing will be found. *See Woodson v. Scott Paper Co.*, 109 F.3d 913, 926 n. 12 (3d Cir.1997). Other courts have disagreed, refusing to penalize plaintiffs for an agency's failure to abide by a worksharing agreement to which it was a party. *See Laquaglia v. Rio Hotel & Casino, Inc.*, 186 F.3d 1172, 1176 (9th Cir.1999); *Bolinsky v. Carter Mach. Co.*, 69 F.Supp.2d 842, 847 (W.D.Va.1999). As the Ninth Circuit in *Laquaglia* explained, "[i]n determining whether [the plaintiff's] claim was 'dual-filed,' it does not matter whether or not her administrative charge actually was forwarded to the EEOC—only whether it was *intended* to be forwarded under the worksharing agreement." 186 F.3d at 1176 (emphasis in original).

The Fourth Circuit, in a case where the plaintiff could prove that a charge was transmitted from one agency to another, but not that the other agency actually received the charge, has taken a similar plaintiff-friendly route. *See Petrelle v. Weirton Steel Corp.*, 953 F.2d 148, 153 (4th Cir.1991). The court, relying upon the terms of the worksharing agreement, which contemplated automatic referral, and testimony from agency workers that charges are routinely referred, invoked the presumption that the agency officials

properly discharged their duties and refused to dismiss the plaintiff's claim. *Id.* Other courts faced with a lack of proof of actual referral have invoked this same presumption on identical grounds. *See McIntyre–Handy v. Telemarketing Corp.,* 97 F.Supp.2d 718, 728 (E.D.Va.2000) ("Therefore, this court presumes that the procedures set forth in the Worksharing Agreement and regularly practiced by employees of the EEOC and VCHR were followed and that plaintiff's claim was referred to the VCHR by the EEOC"); *Melincoff v. E. Norriton Physician Serv., Inc.,* available at 1998 WL 254971, at *11– 12 (E.D.Pa. Apr.20, 1998) ("Therefore, in the instant case, despite the fact that plaintiff did not ever file a separate discrimination charge with the PHRC and ignored the EEOC's offer to dual file his charge with the PHRC on his behalf, the fact that EEOC charges are routinely transmitted to the PHRC pursuant to the EEOC Compliance Manual and worksharing agreement is sufficient to initiate state charges for the limited purpose of the 300–day EEOC deadline").

Both approaches find support within the Second Circuit as well, *see Fitzgerald v. Ford Marrin Esposito Witmeyer & Gleser, LLP,* 37 F.Supp.2d 621, 624 (S.D.N.Y.1999) ("The court ... holds the plaintiff's charge filed with the EEOC, which presumably was forwarded to the state agency pursuant to the Worksharing Agreement, is properly considered initially instituted in the state agency for purposes of invoking the 300–day limitation period"), and are consistent with interpreting these agreements in a way that favors their intended beneficiaries—"the claimants who appear before the agencies," *Ford,* 81 F.3d at 307 n. 5. Indeed, as the court in *Ford* stated:

> [T]he timeliness of a claimant's filing therefore should not be made to depend upon whether one or the other agency follows through on its undertakings under a Worksharing Agreement. It is already difficult enough to understand the deadlines for filing Title VII claims. Claimants who master the intricacies of these deadlines have the right to expect that they will not be penalized by a bureaucrat's non-compliance with the Worksharing Agreement.

*Id.* at 312; *see also Harris v. City of N.Y.,* 186 F.3d 243, 248 n. 3 (2d Cir.1999) ("Generally, courts do not penalize litigants for EEOC's mistakes and misinformation").

■ No matter which approach is adopted, it is clear that the failure to offer proof that the EEOC actually transmitted, and the DHR actually received, Flores's and Blair's charges does not preclude them from receiving the benefit of the 300–day filing period. The common theme to both approaches focuses on what the worksharing agreement contemplates with regards to dual filing. The agreement submitted in this case expressly provides that, because each agency is the designated agent of the other, the EEOC's receipt of charges automatically initiates the proceedings of the other agency. This is done for the express purpose of ensuring a party's compliance with the very Title VII timeliness requirements at issue here. As the court in *Tewksbury* indicated, and as federal regulations confirm, dual filing is not an option—it is a requirement. 29 C.F.R. § 1601.13(a)(3)(iii) ("requir[ing]" EEOC to refer charges originally filed with it where a state agency empowered to resolve the issues raised therein exists).

To the extent that a presumption is appropriate, as noted, where a person files a complaint with the EEOC in a state that has an agency empowered to resolve the issues raised therein, such as New York, 29 C.F.R. § 1601.13(a)(3)(iii) *requires* the EEOC to forward the charge to the state agency. *Tewksbury,* 192 F.3d at 327. Of-

ficials from both the EEOC and the DHR submitted affidavits attesting that charges originally filed with the EEOC are routinely dual-filed with the DHR. *See* Docket No. 94, Aff. of Elizabeth Cadle, Director of EEOC Buffalo Area Office, ¶ 3 ("As with all charges filed in my office, [Flores's and Blair's] charges are dual filed with [DHR]. This is the procedure followed when any charge is filed in the Buffalo Area Office."); Docket No. 95, Aff. of Gina M. Lopez Summa, General Counsel of the DHR, ¶ 4 ("Where a complaint is filed with the EEOC, it is deferred to the [DHR] in accordance with federal law and the worksharing agreement... Such cases ... are considered dual-filed and are timely filed if filed within 300 days of the alleged violation."). Defendants have only alleged that Rotary did not receive notice that a charge was being dual-filed with the DHR, as is required by the worksharing agreement, and that the "EEOC file" contains no record of sending such a notice. This alone, even if true, is not sufficient proof to overcome the presumption that the EEOC officials discharged their official duties, and granting summary judgment on this basis would thwart the purposes behind and interpretation of worksharing agreements that have been embraced (rather emphatically) by the Second Circuit; alternatively, the first of the approaches is adopted. Therefore, no matter which approach is applied here, the lack of evidence regarding the actual transmittal to or receipt by the DHR of Flores's and Blair's administrative charges does not operate to deprive them of the benefit of the 300–day filing period.

### 3. *Failure to direct the EEOC to file with the DHR*

On both Flores's and Blair's EEOC charges, the space indicating an intent to file with both bodies was left blank. The significance of this is perhaps amplified by the fact that both later filed amended administrative charges with the EEOC— Flores on March 26, 1999, and Blair on February 16, 1999—this time affirmatively indicating their desire that the charge also be filed with the DHR. The amended charges would appear tantamount to an admission that, either before or after the initial charges were filed, Flores and Blair believed that they had to affirmatively indicate that the charges were to be filed with both agencies.

■ However, where the provisions of the worksharing agreement are like the ones in the submitted agreement here, what Flores's and Blair's intended or expressed in terms of dual-filing is irrelevant. *Cooper,* 34 F.Supp.2d at 200. Indeed, it is the terms of the worksharing agreement that dominate. Under the submitted agreement, which provides that the DHR waives its jurisdiction, will immediately refer complaints to the EEOC, and that each agency acts as the agent for the other, what the complaining party actually does beyond filing originally with the EEOC "is of no significance." *McGuirk v. E. Gen. Ins. Agency,* 997 F.Supp. 395, 397 (E.D.N.Y.1998). "[Flores's and Blair's] announcement [by omission] of [their] preference could not (and [does] not) amend or circumvent the arrangement crafted by the EEOC and the [DHR], an arrangement intended to facilitate, not confuse, the functioning of an important remedial statute." *Cooper,* 34 F.Supp.2d at 200; *see also Seery,* 203 F.Supp.2d at 44 and 47 (finding on the basis of the worksharing agreement that plaintiff who filed with EEOC 274 days after last alleged act of discrimination to be entitled to extended filing period despite failure to "check the box on the EEOC form stating that he wanted his charge filed with the state agency"); *Nash v. D.S. Nash Constr. Co.,* 70 F.Supp.2d 639, 643 (W.D.Va.1999)

("[C]hecking or not checking the [dual-filing] box has no effect on whether a charge of discrimination will actually be forwarded to the [state agency]. The worksharing agreement, which ensures that charges are automatically forwarded, trumps whatever is entered [on the EEOC's] form and makes checking the box irrelevant for purposes of EEOC claims filed with [the state]"). Thus, Flores's and Blair's failure to affirmatively indicate they wanted their charges dual-filed with the DHR, even despite amending their charges to so indicate, does not deprive them of the 300–day filing period.[6]

### 4. *Failure to submit actual 1999 worksharing agreement*

It is not in dispute that the agreement in effect when Flores and Blair filed their complaints with the EEOC was the 1999 fiscal year worksharing agreement, which covered the period of time from October 1, 1998, to September 30, 1999. A copy of that particular working–sharing agreement has not been submitted to the court. Thus, under normal circumstances, any saving effect the worksharing agreement would have on their claims would be eliminated, *see Maynard v. Pneumatic Prod. Corp.*, 256 F.3d 1259, 1262–64 (11th Cir.2001) (recognizing that terms of worksharing agreement are determinative on question of whether claim can be deemed initially filed with state agency, but dismissing claims as time-barred where actual agreement was not submitted), or, because neither party submitted a copy, further briefing would be required, *see Thompson v. Orange Lake Country Club, Inc.*, 224 F.Supp.2d 1368, 1379 (M.D.Fla.2002) (denying summary judgment and ordering parties to review and submit relevant portions of worksharing agreement, where neither side offered agreement with motion materials).

However, the Second Circuit has made clear that the failure to submit the actual worksharing agreement at issue will not preclude analysis of its provisions, so long as an agreement from another year has been submitted that is substantially the same, *see Ford*, 81 F.3d at 306 ("Because Ford has given us only the 1995 Agreement and because the Center does not dispute the applicability of its terms to this case, we adopt the parties' implicit assumption that the text of the 1991 Agreement is not materially different from the 1995 Agreement provided to us"), or where another court has outlined the provisions of the agreement at issue, *see Tewksbury*, 192 F.3d at 326 n. 2 ("Although neither party has provided us with a copy of the current Agreement, we act on their assumption that its text is not materially different from that quoted in *McGuirk*"). Both situations arguably apply to the instant case.

The EEOC and the DHR have had a worksharing agreement in effect since at least 1982. *See Astoria Fed. Sav. and Loan Ass'n v. Solimino*, 501 U.S. 104, 106, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991). Plaintiffs have submitted a copy of the agreement in effect from October 1, 2000, to September 31, 2001. (Docket No. 95, attached.) Though defendants apparently refuse to concede that the terms stated therein are similar to the worksharing agreement in effect when Flores and Blair filed their charges, it is doubtful that this is true. As noted, the two relevant parts of the submitted agreement read, *inter alia*, as follows: (1) "[T]he EEOC and the [DHR] each designate the other as its

---

6. To the extent *Briggs v. N.Y. State Dep't of Transp.*, 233 F.Supp.2d 367, 374 (N.D.N.Y. 2002), and *Harrington v. County of Fulton*, 153 F.Supp.2d 164, 169 n. 2 (N.D.N.Y.2001), can be read to be inconsistent with this conclusion, they are not followed.

agent for the purpose of receiving an drafting charges... EEOC's receipt of charges on the [DHR's] behalf will automatically initiate proceedings of both [the] EEOC and the [DHR] for the purposes of [the filing requirements] of Title VII"; and (2) "The [DHR] waives its right of exclusive jurisdiction to initially process all charges for a period of 60 days ... to allow the EEOC to proceed immediately with the processing of charges originally received by the EEOC[.]" *Id.*

Plaintiffs have submitted an affidavit from the program manager of the EEOC's New York district office. (Docket No. 93.) In the affidavit, he claims that "[t]here have been no substantive changes in the processes, procedures, statutes, policies or regulations [in the worksharing agreement] since September 14, 1998," and that since that date the agreement has merely be extended on a yearly basis. *Id.* at ¶¶ 2–3. Attached to the affidavit are copies of two signed extensions of the agreement, one extending the agreement that was executed for fiscal year 1999 (October 1, 1998, to September 30, 1999) through fiscal year 2000, and the other extending the agreement signed for fiscal year 2002 to fiscal year 2003. A copy of the worksharing agreement in effect from October 1, 2000, to September 30, 2001, is also attached.

Though defendants explicitly refuse to agree that the attached worksharing agreement is substantively the same as the one in effect at the time Flores and Blair filed their complaints with the EEOC, they offer no evidence to contradict the program manager's affidavit. At the summary judgment stage, once plaintiffs offered the affidavit of the program manager, who claims that no substantive changes have been made to the agreement, it was incumbent on defendants, if they wished to demonstrate that no material facts were in dispute, to offer proof as to how the agree-

ment submitted is different from the agreement in effect at the time the charges were filed. The mere voicing of disagreement does not satisfy that burden.

Furthermore, the language quoted from the attached agreement is found in identical fashion—in terms of substance and, often, word choice—in the worksharing agreements in effect throughout the 1990's. *Tewksbury,* 192 F.3d at 326 (1996 fiscal year agreement); *Ford,* 81 F.3d at 306–08 (1991, 1992, and 1995 fiscal year agreements); *Fitzgerald,* 37 F.Supp.2d at 625 (1995 fiscal year agreement); *Morris v. Northrop Grumman Corp.,* 37 F.Supp.2d 556, 567 (E.D.N.Y.1999) (1994 fiscal year agreement); *Cooper,* 34 F.Supp.2d at 200 (1997 fiscal year agreement); *Mayo v. Sec. Indus. Ass'n,* No. 95 Civ. 4350, available at 1995 WL 608291 (S.D.N.Y. Oct.17, 1995) (1994 fiscal year agreement); *Shumway v. Hendricks,* Civ. No. 93–CV–485, available at 1994 WL 672656 (N.D.N.Y. Nov.28, 1994) (1992 fiscal year agreement). And, in each case, the provisions have been interpreted to extend the filing period to 300 days. It would therefore appear nonsensical to substantively modify the provisions, especially when it is noted that the court in *Tewksbury* rendered its decision in the latter half of 1999.

In any event, regardless of whether the submitted agreement differs substantively, as noted, a court is permitted to analyze the provisions of a non-submitted worksharing agreement where they have been outlined by another court. In *Feldman, supra,* the plaintiff filed her charges with the EEOC during fiscal year 1999—the same year Flores and Blair filed their charges—which ran from October 1, 1998, to September 30, 1999. As suspected, the relevant provisions of the fiscal year 1999 agreement are substantially similar, if not virtually identical, to the provisions found

in the agreement submitted by plaintiffs. Specifically, the court in *Feldman* quotes the agreement as stating, "the EEOC and the [DHR] each designate the other as its agent for the purpose of receiving and drafting charges." *Id.* at *4. The court also noted that the agreement contained "a waiver of the [DHR's] exclusive right to process the charge." *Id.* at *5. As noted, these provisions combine to form the proposition that in New York, where a plaintiff originally files a charge with the EEOC, he or she is deemed to have "initially instituted" proceedings with the DHR and to have filed with the EEOC on the date the EEOC received the charge, and is therefore entitled to the 300–day filing period.

### 5. *Conclusion*

Thus, neither the failure to demonstrate actual transmittal of the charges by the EEOC, nor Flores's and Blair's lack of intent to file with both agencies, nor the absence in the submitted evidence of the fiscal year 1999 worksharing agreement, operate to deprive Flores and Blair of the extended 300–day filing period.[7] Therefore, the 300–day filing period will be applied to Flores's and Blair's claims. All of their claims are timely.

### 6. *Application of the 300–day filing period*

Thus, any discriminatory acts on or after March 20, 1998, are properly included in Flores's Title VII claims, and any such acts on or after March 21, 1998, are properly included in Blair's Title VII claim. Blair affixes no pre-March date to any of her specific allegations, and the only two which Flores allege occurred earlier than that date, (Docket No. 51, ¶¶ 20–21, 45–46), are clearly irrelevant to both of her Title VII claims.[8] Both, however, make a considerable number of undated allegations.

■ For Flores, the undated allegations are all introduced or accompanied by a phrase like "on certain occasions," *id.* at ¶ 19, "constantly," *id.* at ¶¶ 25 and 27, "on numerous occasions," *id.* at ¶ 26, and "on several occasions," *id.* at ¶¶ 30–33 and 50–53, thus implying that the alleged conduct occurred throughout her employment. To the extent that such implication is not raised, the allegations can be considered along with the timely allegations as part of her Title VII claims if they fall within the continuing violations doctrine. The doctrine, though not looked upon kindly in the Second Circuit, *see Findlay v. Reynolds Metals Co.*, 82 F.Supp.2d 27, 37 (N.D.N.Y. 2000), is properly invoked where a plaintiff

---

**7.** It is conceded that a previous decision in this case held that Schnoop had not filed a charge with the DHR. (Docket No. 46.) However, such decision was issued in the context of determining whether, under New York law, she had filed with the DHR, and only "for election of remedies purposes within the meaning of Section 297(9)." *Id.* It is also worth pointing out that, in the papers that preceded that decision, defendants argued for the position that is adopted here—that filing with the EEOC is considered filing with the DHR. Per *Tewksbury*, however, the fact that such a position is adopted would not alter the election of remedies analysis, as the DHR proceedings are deemed to simultaneously be-

gin and end upon the EEOC's receipt of a complaint.

**8.** In paragraphs 20–21 and 45–46 of her complaint, Flores alleges: (1) "That in February of 1998, defendant Keith Barry told [her] that he had several acres of land for her to graze on"; and (2) "That in March of 1998, an agent of defendant Rotary, told [her] to '[w]atch out because there were dog catchers in the neighborhood.'" While both allegations, if true, indicate the ignorant, mean-spirited, wrong-headed, classless, bold (in a stupid way), callous, and contemptible nature of the speakers, they are not specifically tied to or claimed to be motivated by gender or national origin.

makes one of two demonstrations: (1) specific ongoing discriminatory policies; or (2) specific and related instances of discrimination that the employer permits to continue for such a time that the instances amount to a discriminatory policy or practice, *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 766 (2d Cir.1998). Thus, "the continuing violation exception is usually associated with a discriminatory policy, rather than with individual instances of discrimination." *Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir.2001).

■ Certain of the undated allegations made by Flores do not relate to either sexual harassment or national origin discrimination, but rather to the physical abuse she received at the hands of Makarwich. (Docket No. 51, ¶¶ 30–33, 50–53.) Though deplorable in its own right, and perhaps giving rise to redress under other laws, such abuse—without any concomitant allegations that it was tied to or motivated by gender or national origin—does not find relief in Title VII. The other undated allegations, however, which detail disgustingly crude comments made to Flores that explicitly or implicitly are of a sexual nature, do amount to a claim that she was subjected, over protest, to a pattern, practice, and or policy, arguably endorsed by the company (if the allegations are true), of sexual harassment. Thus, the continuing violations doctrine does permit these allegations to be considered along with the otherwise timely ones in Flores's sexual harassment claim.

Likewise, the undated allegations made by Blair, (Docket No. 51, ¶¶ 72–75, 78–80), with the exception of those relating solely to physical abuse, *id.* at ¶ 82, are all explicitly or implicitly of a sexual nature, and indicate, if true, a non-stop stream of sexually charged and offensive comments directed at her by Makarwich and Barry. Under the continuing violations doctrine—

to the extent these allegations can be said to pre-date March 21, 1998—these allegations can all be considered as part of Blair's sexual harassment claim.

## D. Flores's National Origin and Schnoop's Sexual Harassment Claims

### 1. Discrimination standards

Under Title VII, it is unlawful "for an employer ... to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's ... sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). "The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quotations and citations omitted); *Torres v. Pisano*, 116 F.3d 625, 630 (2d Cir.1997). Schnoop, Flores, and Blair all claim they were subjected to a hostile or abusive work environment on the basis of their sex, and Flores also claims she was subjected to the same on the basis of her national origin. As noted, because defendants moved for summary judgment on the substantive merits of only Schnoop's sex discrimination claim and Flores's national origin discrimination claim, the merits of Flores's and Blair's Title VII sexual harassment claims will not be discussed.

### 2. National origin—Flores

■ In addition to her sexual harassment claim, Flores claims she was subjected to a hostile work environment claim based on her national origin. " 'In order to survive summary judgment on a claim of hostile work environment [national ori-

gin or race] harassment, a plaintiff must produce evidence that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe and pervasive to alter the conditions of the victim's employment.'" *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir.2000) (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir.2000)). To be sufficiently severe and pervasive, the acts alleged to comprise the harassment "must be repeated and continuous; isolated acts or occasional episodes will not merit relief[,]" *Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 62 (2d Cir.1992), unless such acts or episodes were "extraordinarily severe," *Whidbee*, 223 F.3d at 69 (quoting *Cruz*, 202 F.3d at 570).

■ As noted, *supra*, the pre-March 1998 conduct alleged in Flores's complaint is not alleged to have been tied to or motivated by her national origin. *See* note 7. The same is the case with the remainder of her allegations, with the exception of two. Flores claims in those allegations that, on two occasions "in May of 1998," Mararwich: (1) "told [her] that she was a 'wetback,' referring to her Mexican heritage"; and (2) "told [her] that her hair was greasy and therefore ther[e] must be some 'wetback' in her, referring to her Mexican heritage." (Docket No. 51, ¶¶ 47–48.) While these comments, if true, are clearly offensive and ill-suited to the work environment, or any environment for that matter, they are the only comments that were clearly or by implication directed at or motivated by her national origin. As such, it cannot be stated that the harassment was severe and pervasive. Flores does not allege that she was called this name on more than these two occasions, which is significant in light of the fact that many of

her other allegations contained language that the conduct complained of therein was "constant" or exhibited on "several" or "numerous" occasions, *see supra*. Thus, without more than these two isolated comments, Flores cannot maintain her national origin discrimination claim under Title VII or the NYHRL.

### 3. *Sexual harassment—Schnoop*

#### a. *Plaintiff's acts*

■ Title VII and the New York State Human Rights Law employ an identical standard to determine if the substantive elements of a hostile work environment/sexual harassment claim has been proven. *Martin v. N.Y. State Dep't of Corr. Servs.*, 115 F.Supp.2d 307, 311 (N.D.N.Y.2000) (citing *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1304 n. 4 (2d Cir. 1995)). To prevail, a plaintiff must prove that she is a member of a protected class, that she was subjected to unwelcome advances by her supervisor, that such harassment was based upon her sex, and that it affected a term, condition, or privilege of her employment. *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1042 (2d Cir.1993). Such proof involves both subjective and objective components. *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 765 (2d Cir.1998).

Defendants appear to base entitlement to summary judgment on Schnoop's sexual harassment claim on two arguments—that her "personal credibility is so tainted and her factual assertions are so self-contradictory and implausible that they are totally unworthy of belief by any reasonable and rational juror," and that she cannot demonstrate that any conduct directed at her was "unwelcome." (Docket No. 88, pp. 19–25.) [9] Though it is not entirely clear that

---

**9.** Because defendants have not moved for summary judgment on any other bases with

respect to this claim, the remaining elements

these two arguments are all that different, both are rejected and summary judgment must be denied.

■ With respect to the former argument, one court has indeed dismissed a sexual harassment claim where it was found that "[the] plaintiff's credibility ha[d] been eroded, and further that she ha[d] failed to prove her allegations." *See Locastro v. E. Syracuse–Minoa Cent. Sch. Dist.*, 830 F.Supp. 133, 138 (N.D.N.Y.1993). However, that decision was a *bench trial decision* rendered "based on the evidence presented *at trial*." *Id.* (emphasis added). In any event, suffice it to say that credibility determinations are within the province of the jury. If indeed her assertions are "self-contradictory and implausible," defense counsel is invited to prove and highlight as much on cross-examination or through other fact witnesses. At the summary judgment stage, however, the facts are construed in a light most favorable to her, and on the facts alleged, it cannot be concluded as a matter of law that she has failed to state a claim of sexual harassment.

■ Likewise, whether the conduct directed at her was "welcome" is also a matter for the jury. Defendants base their argument that the conduct was welcome on what they claim was Schnoop's "sexually provocative dress and behavior," and because she "never once told Mr. Barry or Mr. Fountain that she was 'offended by language or actions' at Rotary." (Docket No. 88, p. 23.) Like the credibility determination, whether her dress and behavior were sufficiently provocative such that the conduct could be deemed welcome is a factual question. *See Meritor Sav.*

*Bank, FSB v. Vinson*, 477 U.S. 57, 68, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (stating that the "question [of] whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact"). In addition, there is no conclusive evidence that Schnoop expressed approval of any of Barry's conduct. She claims to have exhibited disgust at his comments and rejection of his implied advances on a continuous basis. Further, even assuming that Schnoop can be said to have never objected to Barry's conduct, neither to him nor to Fountain—though she claims she did inform Barry his alleged conduct, comments, and innuendo were unwelcome—that fact would not be dispositive in light of the questions surrounding whether the company, through Fountain's September 1998 speech, had in place a reasonable procedure for dealing with sexual harassment. *See infra.* If it did not, surely she cannot be penalized for failing to utilize something that did not exist. Summary judgment on the merits of Schnoop's sexual harassment claims under Title VII and the NYHRL must be denied.

### b. *Liability* of Rotary

#### i. Employer standards

■ As noted, Rotary did not move for summary judgment on the substantive merits of Flores's and Blair's Title VII sexual harassment claims. Rotary does, however, argue that, even if Schnoop was sexually harassed, there is no basis for imputing liability for such harassment to her employer.[10]

---

of a sexual harassment claim need not be discussed.

**10.** As noted, *supra* note 1, Schnoop's Title VII claim against Barry was previously dismissed. (Docket No. 46.) Likewise, to the extent

Flores's and Blair's Title VII sexual harassment claims are asserted against Barry and/or Makarwich, they must be dismissed. *See Mandell v. County of Suffolk*, 316 F.3d 368,

■ The employer is the entity held responsible for Title VII violations. Whether Rotary can be held liable for any sexually harassing conduct turns on three separate inquiries, the last of which Rotary bears the burden of persuasion: (1) whether Barry, as the party alleged to be the perpetrator of the harassment, was Schnoop's "supervisor"; (2) whether a tangible employment action was taken against her in connection with the harassment; and (3) whether Rotary exercised reasonable care to prevent and correct the harassment, and whether Schnoop failed to take advantage of the preventive or corrective opportunities so presented or failed to avoid harm otherwise. For Schnoop's sexual harassment claim to survive, the first inquiry and either the second or third inquiry must be resolved, at the summary judgment stage, in her favor.

ii. Barry was Schnoop's supervisor

Assuming Schnoop was sexually harassed, in order for Rotary to be held liable for this harassment, she must initially demonstrate that Barry was a supervisor. *See Mack v. Otis Elevator Co.*, 326 F.3d 116, 123 (2d Cir.2003) ("The starting point for analyzing employer vicarious liability in a Title VII hostile work environment action is to determine whether the person who allegedly created that environment is properly characterized as having been the plaintiff's 'supervisor'"). In *Mack,* the Second Circuit found the EEOC's definition of supervisor to be "persuasive." *Id.* at 127. According to the agency's enforcement guidelines, " '[a]n individual qualifies as a an employee's 'supervisor' if: (a) the individual has authority to undertake or recommend tangible employment decisions affecting the employee; *or* [t]he individual has authority to direct the employee's daily work

activities.' " *Id.* (quoting EEOC Enforcement Guidance on Vicarious Employment Liability for Unlawful Harassment by Supervisors, 8 FEP Manual (BNA) 405:7654 (1999) (emphasis in original)).

■ Here, Barry was the highest-ranking Rotary representative at the company's distribution warehouse in Guilderland, New York. He was responsible for overseeing, developing, and, if necessary, changing the work activities and schedules of employees working in the facility. He was the individual who interfaced with headquarters management in Georgia, and, in fact, was the company representative who reprimanded Makarwich verbally and in writing when it was discovered that he had called Flores an inappropriate name. There is no question that Barry falls within the EEOC-adopted definition of a supervisor. Accordingly, assuming Schnoop can prove at trial that she was sexually harassed by Barry, Rotary will be held liable if she demonstrates that she suffered a tangible employment action, or if Rotary is unable to prove its affirmative defense in the third inquiry, *infra.*

iii. Tangible employment action

■ Under Title VII, where the perpetrator of the harassment was the victim's supervisor, an employer is presumed responsible. *Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Leopold v. Baccarat, Inc.*, 239 F.3d 243 (2d Cir.2001). If sexual harassment is found to have occurred, agency law principles, and not the specific cause of action framed by a plaintiff, are what give rise to this presumption. *Jin v. Metro. Life Ins. Co.*, 295 F.3d 335, 342 (2d Cir.2002) (citing *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 754, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)). In other words,

377 (2d Cir.2003) (no individual liability for supervisors under Title VII).

the presumption of employer liability does not automatically arise. The perpetrator must have not only been using his or her position as a supervisor to aid the harassment, such aid must comprise "something more" than the agency relationship itself. *Id.* at 342–43 (citing *Ellerth*, 524 U.S. at 760, 762–63, 118 S.Ct. 2257). "Although the [Supreme] Court did not define the exact contours of what that 'something more' would have to be, it did identify one class of cases that clearly satisfies the standard: 'when a supervisor takes a tangible employment action against the subordinate.'" *Id.* (quoting *Ellerth*, 524 U.S. at 760, 118 S.Ct. 2257).

Here, Schnoop alleges she was constructively discharged. The Second Circuit has held that, where an employee alleges she suffered sexual harassment from a supervisor, and quits because of such harassment, as opposed to being fired, no tangible employment action was taken. *See Caridad v. Metro–North Commuter R.R.*, 191 F.3d 283, 294 (2d Cir.1999); *but see Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 97 (2d Cir.2002) (noting that where claim is that continued employment is conditioned on submission to sexual demands, tangible employment action may be found). Accordingly, assuming Schnoop is able to prove that Barry sexually harassed her, and that there was no tangible employment action, Rotary will be liable unless it is able to prove its affirmative defense.

iv. Faragher/Ellerth affirmative defense

■ If no tangible employment was taken against Schnoop, Rotary may escape liability for any sexual harassment visited upon her by Barry if it can demonstrate: "(1) that [it] exercised reasonable care to prevent and correct any sexually harassing behavior, and (2) that [Schnoop] unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807–08, 118 S.Ct. 2275; *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257. The employer bears the burden of persuasion with regard to proving this affirmative defense. *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257.

With respect to the first prong—whether the employer exercised reasonable care in preventing and correcting inappropriate behavior—Rotary argues that, via Fountain's September 1998 oral address to the Guilderland facility's employees, it put the employees, including Schnoop, on notice that harassment would not be tolerated, and offered the opportunity to contact Fountain as an avenue of complaint. This is not enough to demonstrate satisfaction of the first prong as a matter of law.

■ First, despite Rotary's somewhat amazing claim that "the [oral] presentation of such policy by Mr. Fountain was *at least as effective* as any written policy Rotary might have promulgated and should be given *at least equal weight* to any written policy by the Court," (Docket No. 99, p. 9) (emphasis added), there is no evidence that the company had a written anti-harassment policy in existence during the relevant time period. Second, even assuming that Fountain's oral announcement during the meeting can be considered a policy, it was not specific as to sexual harassment. "'[T]he mere existence of a grievance procedure ... coupled with [plaintiff's] failure to invoke that procedure' does not serve to insulate an employer from liability on summary judgment." *See Robles v. Cox & Co.*, 154 F.Supp.2d 795, 805 (S.D.N.Y.2001) (quoting *Meritor*, 477 U.S. at 72, 106 S.Ct. 2399); *see also Bayard v. Riccitelli*, 952 F.Supp. 977, 985 (E.D.N.Y.1997) (stating that a mere showing that a plaintiff knew where to direct complaints is insufficient to grant an employer's motion for summary

judgment). "Where a policy does not alert employees to their employer's interest in correcting sexual harassment [specifically], it does not, on its own, constitute reasonable care." *Robles,* 154 F.Supp.2d at 805.

■ Third, and perhaps most importantly, there is a factual question as to whether the investigation and allegedly corrective measures taken as a result of Schnoop's complaint were reasonable. Where, as here, the harassment alleged is the epitome of pervasive and severe, the attention directed towards it allegedly scant and inconsequential, and the procedure and trained professionals in place to address it allegedly nonexistent, summary judgment is particularly inappropriate. *Yerry v. Pizza Hut of Southeast Kansas,* 186 F.Supp.2d 178, 186 (N.D.N.Y.2002).

The second prong of the affirmative defense—whether Schnoop unreasonably failed to take advantage of the corrective opportunities offered by Rotary or to otherwise avoid harm—cannot be resolved at summary judgment either. Rotary bears the initial burden of demonstrating that Schnoop completely failed to utilize the complaint procedures in place. *Leopold,* 239 F.3d at 246. If this burden is carried, Schnoop is required to identify the reasons why the complaint procedures were not used. *Id.* Rotary is then entitled to rely on the absence or inadequacy of the proffered reason or reasons in carrying its ultimate burden of persuasion of the second prong. *Id.* Before any of these questions can be resolved, it needs to be determined whether Rotary did, indeed, through the September 1998 meeting at which Fountain spoke to the employees, have in place a reasonable sexual harassment policy. Thus, summary judgment is inappropriate on Schnoop's Title VII sexual harassment claim against her employer, Rotary.

## E. New York State Human Rights Law

### 1. Introduction

As noted, each of the three intervening plaintiffs have alleged a sexual harassment claim against Rotary and certain individual defendants under the NYHRL. Both the company and the individual defendants allege that, even if sexual harassment occurred, they cannot be liable therefor. The potential liability of both groups will be discussed.

### 2. Rotary

■ Though determination of whether a substantive sexual harassment violation has occurred is the same under Title VII and the New York Human Rights law, the standards governing imputation of liability to the employer differ. *See, e.g., Dyke v. McCleave,* 79 F.Supp.2d 98, 102 (N.D.N.Y. 2000) (collecting cases). "It has been well documented, by both federal courts within the Second Circuit and by New York state courts, that employer liability under the NYHRL ... requires a more stringent showing [than it does under Title VII], in particular, that the employer had knowledge of and acquiesced in, or subsequently condoned, the discriminatory conduct." *Bennett v. Progressive Corp.,* 225 F.Supp.2d 190, 210 (N.D.N.Y.2002) (collecting cases). " 'Condonation ... contemplates a knowing, after the fact forgiveness or acceptance of an offense. An employer's calculated inaction in response to discriminatory conduct may, as readily as affirmative conduct, indicate condonation.' " *Id.* (quoting *Father Belle Cmty. Ctr. v. State Div. of Human Rights ex rel. King,* 221 A.D.2d 44, 642 N.Y.S.2d 739, 746 (App. Div.1996)).

■ Even under this heightened standard, summary judgment is still inappropriate. At the outset, factual questions

exist as to whether Makarwich or Barry are considered supervisors such that they can be deemed to have acted on Rotary's behalf. If so, both would be deemed as knowing of and certainly through their behavior, approving or condoning, the harassment alleged. Even if only Barry was considered a supervisor who could impute knowledge to the company, the same conclusion may be reached, as Flores and Blair allege that they reported all incidents of discrimination to him, who they also allege was sometimes a participant, and he is cited as the sole perpetrator of the harassment of Schnoop.

Further, there are a multitude of factual questions surrounding the company's sexual harassment policy and the procedure in place for dealing with violations or suspected violations of the policy, most prominent of which are whether such a policy or procedure even existed. With respect to Flores, if it is found that the company did not conduct an adequate investigation into her complaints once it became aware of it (whether constructively through Makarwich or Barry, or through her phone complaint to Georgia), a jury could find in her favor. The same applies to Blair's claim, which a reasonable jury could find the company was aware of through Makarwich or Barry, or through Flores's telephone complaint.

If it is found that the company, through the September 1998 meeting, did not have in effect a reasonable procedure for sexual harassment complaints, and a reasonable procedure for dealing with those complaints, a reasonable jury could find that Rotary did, in effect, condone sexual harassment in general and, by implication, of Schnoop. Such a finding could be further supported by the fact that, per Flores's phone call to a company human resources representative, Tootle, who subsequently relayed it's substance to Foun-

tain, Rotary was on notice that rather pervasive sexual harassment was occurring, or was alleged to be occurring, or could certainly occur, at the distribution warehouse where Schnoop worked.

Indeed, one need look no further than the way in which defendants are portraying the September 1998 meeting itself to conclude that the company was aware of the problem or potential problem, and was aware of its lack of direction to employees about it. Rotary sent a company vice president and, importantly, a human resources representative, to give the presentation. These individuals were not simply walking down the hallway from their offices to give such presentation—they flew in from Georgia. Thus, because of these various factual questions, summary judgment on the grounds that liability for any sexual harassment cannot be imputed to Rotary must be denied.

### 3. *Individual defendants*

Makarwich and Barry have moved for summary judgment on all NYHRL claims asserted against them. As noted, neither can be held liable for any Title VII violation. *Mandell*, 316 F.3d at 377. "Individual liability is sometimes possible, however, under [the NYHRL]." *Id.* Though the Second Circuit did not indicate in which ways such liability is possible, employees escape individual liability under the NYHRL's general discrimination provision, N.Y. Exec. Law § 296(1). Under that provision, like Title VII's general discrimination provision, only employers may be held liable for discriminatory conduct occurring in or by virtue of the workplace. Thus, the most plausible reading of the Second Circuit's statement is that individuals may be liable under N.Y. Exec. Law § 296(6), which makes it an unlawful discriminatory practice "for any person to aid, abet, incite, compel or

coerce the doing of any of the acts forbidden under [the NYHRL], or to attempt to do so." This provision, known as the aiding and abetting provision, is invoked where an individual defendant " 'actually participates in the conduct giving rise to a discrimination claim' " under the general discrimination provision. *See Bennett,* 225 F.Supp.2d at 213 (quoting *Hasbrouck v. Bankamerica Hous. Serv., Inc.,* 105 F.Supp.2d 31, 39 (N.D.N.Y.2000)).

 To the extent that Makarwich and Barry claim they cannot be held liable under the aiding and abetting provision because they were the primary actors in the alleged discrimination under Section 296(1), such an argument—though certainly not devoid of logic and perhaps policy support—is rejected in light of *Mandell* and for the same reasons it was rejected in *Bennett,* 225 F.Supp2d at 214, which will not be repeated and explained again here. However, just because it is possible that Makarwich and Barry could incur individual liability for Rotary's violation of Section 296(1) does not mean that they automatically do. Flores, Blair, and Schnoop will all have to prove the elements of their sexual harassment claims, and that the individual defendant or defendants at issue actually participated in such harassment. Thus, Makarwich's and Barry's summary judgment motions will be denied in this regard.

## IV. CONCLUSION

To recap, Flores's and Blair's Title VII claims are timely, though Flores's national origin discrimination claim will be dismissed on the merits under both Title VII and the NYHRL. Factual questions surrounding both the merits and issues going to imputation of liability preclude summary judgment on Schnoop's sexual harassment claim under both Title VII against Rotary and the NYHRL against Rotary and Barry. Factual questions also preclude summary judgment on whether liability can be imputed to Rotary and the individual defendants for any NYHRL sexual harassment claims by Flores and Blair. All Title VII claims against Makarwich and Barry will be dismissed, though the same is not the case under the NYHRL. Flores's national origin discrimination claims under Title VII and the NYHRL must be dismissed.[11]

Accordingly, it is

ORDERED that

1. Defendant Rotary Corporation's motion for summary judgment is GRANTED with respect to Elizabeth Flores's national origin discrimination claims under Title VII and the NYHRL, and DENIED in all other respects;

2. Defendant Keith Barry's motion for summary judgment is GRANTED with respect to all remaining Title VII claims, and with respect to Elizabeth Flores's national origin discrimination claim under the NYHRL, and DENIED in all other respects; and

3. Defendant Alan Makarwich's motion for summary judgment is GRANTED with respect to all Title VII claims, and with respect to Elizabeth Flores's national origin discrimination claim under the

---

**11.** Trial will be held on Schnoop's, Flores's, and Blair's sexual harassment claims under Title VII against Rotary and under the NYHRL against Barry. Also at trial will be Flores's and Blair's sexual harassment claims under the NYHRL against Makarwich. Because the substantive merits of sexual harassment claims are identical under Title VII and the NYHRL, there will be no need for a separate inquiry regarding whether Rotary violated the general discrimination provision of the NYHRL.

NYHRL, and DENIED in all other respects.

IT IS SO ORDERED.