**Jorge TORRICO, Plaintiff,**

v.

**INTERNATIONAL BUSINESS MACHINES CORPORATION, Defendant.**

**No. 01 Civ. 841(GEL).**

United States District Court, S.D. New York.

March 9, 2004.

Timothy N. Seward, Potomac, MD, for Plaintiff.

John Houston Pope, Epstein, Becker & Green L.L.P., New York, NY, for Defendant.

## OPINION AND ORDER

LYNCH, District Judge.

Plaintiff Jorge Torrico, a Chilean national with permanent resident alien status, brought this action against his former employer, defendant International Business Machines Corporation ("IBM"), alleging violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and pendent claims under the New York Human Rights Law ("NYHRL"),

N.Y. Exec. L. § 290 *et seq.*[1] IBM moved to dismiss pursuant to Fed.R.Civ.P. 12(c) on the ground that neither the ADA nor the NYHRL applies extraterritorially to protect Torrico, a non-citizen on temporary assignment in Chile at the time IBM discharged him. Construing the pleadings in the light most favorable to Torrico, the Court held that Torrico's complaint adequately alleged that both statutes protect him because, his foreign citizenship and temporary assignment abroad notwithstanding, he remained "employed" in the United States within the meaning of the ADA during his tenure with IBM, *Torrico v. Int'l Bus. Mach. Corp.*, 213 F.Supp.2d 390, 404 (S.D.N.Y.2002), and the alleged discriminatory acts took place either in New York State or against a New York "resident" within the meaning of the NYHRL. *Id.* at 407. With discovery now complete, IBM moves for summary judgment pursuant to Fed.R.Civ.P. 56, arguing that the evidence fails to substantiate the allegations the Court previously held sufficient to bring Torrico within the protection of the ADA or the NYHRL; that Torrico failed timely to file a complaint with the EEOC; and that, in any event, his claims fail on the merits. Torrico cross-moves for partial summary judgment on liability. For the reasons that follow, both motions will be denied.

## BACKGROUND

■ In 1982, Torrico began working in the United States, and from then until 1994, he held a series of jobs with companies located, respectively, in Illinois, Tennessee, Washington, D.C., and Maryland. (Pope Decl., Ex. 15.) Torrico became a U.S. permanent resident alien in 1986 (3d

1. Torrico initially asserted additional claims under 42 U.S.C. § 1981 and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, but he abandoned those claims subsequently, and the Court dismissed them pursuant to Fed.R.Civ.P. 41(a)(2). *Torrico v. Int'l Bus. Mach. Corp.*, 213 F.Supp.2d 390, 395–96 (S.D.N.Y.2002).

Torrico Decl. ¶ 9),[2] and in 1994, he resided in Virginia, where he owned a home and paid property taxes. (D. Rule 56.1 Stmt. ¶¶ 2–3.) On September 6, 1994, IBM hired Torrico as General Manager of Telecommunications and Media Industry for IBM Latin America ("IBM/LA"), a division of IBM headquartered in Mt. Pleasant, New York. (P. Rule 56.1 Stmt. ¶ 5.)

Torrico's duties required "extensive travel to meet with corporate executives and officers in the telecommunications industry throughout Latin America," and from the outset, he therefore spent substantial time abroad. (2d Torrico Decl. ¶ 3; D. Br. 3.) But while working in the United States, he commuted to IBM/LA's New York headquarters, staying in hotels (D.Br.3), and on weekends, returned to Virginia to be with his wife. (Torrico Tr. 164.) IBM initially subsidized Torrico's commuting expenses and expected to subsidize his relocation to the New York tri-state area. (Pope Aff., Ex. 11; D. Br. 3.) But it quickly became evident that Torrico's duties could best and most efficiently be performed from a location in Latin America. (D. Br. 3; 2d Torrico Decl. ¶ 3.) Effective July 1, 1995, IBM/LA therefore placed Torrico on temporary international assignment to Santiago, Chile, for an initial term of three years. (P. Rule 56.1 Stmt. ¶ 6; Seward Decl., Ex. 1.) Torrico's assignment memorandum from Diane M. Adams, an IBM International Assignment Representative, emphasized the temporary nature of his assignment:

> International assignments are temporary in nature. The length of your assignment is based on present business requirements and is subject to change at the discretion of IBM. You are expected to reenter your home country at the completion of your assignment or any extension. However, you may not necessarily return to the same division, subsidiary, group, etc., from which you left. You are cautioned that personal or job-related plans or commitments you make should take into consideration the temporary nature of this assignment and the planned return date to your home country. You are on a rotational assignment agreed to by IBM Latin America, and they will be responsible for planning your next position in the U.S.[3]

(Seward Decl., Ex. 1.) In a letter to the U.S. Department of Justice, Donald A. Comilloni, IBM's manager of international assignments, wrote that "[f]ollowing this assignment, [Torrico] will be reassigned to a position in the United States" (*id.*, Ex. 2), and an internal IBM memorandum sent from Adams to Mario Bethlem, then Torri-

---

**2.** IBM objects to Torrico's Third Declaration as a "sham affidavit" because it makes some assertions that allegedly contradict his prior deposition testimony. (D. Reply Br. 1 & n. 1, 6, 8.) *See Palazzo ex rel Delmage v. Corio*, 232 F.3d 38, 43 (2d Cir.2000) ("[I]n opposing summary judgment, a party who has testified to a given fact in his deposition cannot create a triable issue merely by submitting an affidavit denying the fact."); *see also Perma Research and Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir.1969). The so called "sham affidavit" rule does not apply in two situations: first, where the subsequent sworn statement either does not actually contradict the affiant's prior testimony or "addresses an issue that was not, or was not thoroughly,

explored in the deposition," and second, where "that testimony is contradicted by evidence other than the deponent's subsequent affidavit, for when such other evidence is available, the concern that the proffered issue of fact is a mere 'sham' is alleviated." *Corio*, 232 F.3d at 43–44. The Court will therefore consider Torrico's Third Declaration to the extent it augments, without contradicting, his deposition testimony, addresses issues not explored thoroughly in that deposition, or finds support in other evidence in the record.

**3.** Peter T. Rowley, Torrico's supervisor (Seward Decl., Ex. 4), received a copy of this memorandum. (*Id.*, Ex. 1 at 3.)

co's career manager, solicited IBM/LA's agreement that at the conclusion of Torrico's assignment, he would be "re-enter[ed]" in a position "at no lower [a] level than the pre-assignment level, except under extenuating circumstances agreed to by [his] divisional personnel management." (*Id.*, Ex. 2A.)

Throughout his tenure with IBM/LA, and notwithstanding his assignment abroad, IBM treated Torrico as it did other U.S. executive employees in regard to salary, benefits, and stock options, the latter of which it offered solely to U.S. executive employees. (P. Rule 56.1 Stmt. ¶¶ 9–12.) IBM also withheld federal and state income taxes from Torrico's salary. (2d Seward Decl., Ex. 34.) While Torrico worked primarily in Chile, he returned to the United States about once every two months to attend meetings, and he reported to IBM/LA's New York headquarters. (P. Rule 56.1 Stmt. ¶ 12.) IBM extended Torrico's assignment twice, initially from July 1, 1998, to December 30, 1998, and subsequently to June 30, 1999. (*Id.* ¶ 15; D. Rule 56.1 Stmt. ¶ 10.) Effective December 31, 1998, Torrico's job title became "Vice President Sales." (P. Resp. to D. Rule 56.1 Stmt. ¶ 12.) Torrico testified that "as of January of 1999, [IBM/LA] was diminished from 1200 people, approximately, to 200 people in Miami." (Torrico Tr. 94.) While IBM asserts that it eliminated Torrico's position at this time (D. Rule 56.1 Stmt. ¶ 12), Torrico maintains that IBM merely modified his existing position to one commensurate with IBM/LA's "substantially reduced size and mission." (P. Resp. to D. Rule 56.1 Stmt. ¶ 12.)

In January 1999, some six months before his assignment abroad ended, Torrico became ill. Augusto Brizzolara, a Chilean physician, directed Torrico to take a thirty-day leave, pending a detailed diagnosis, and on January 26, 1999, Torrico so informed IBM/LA. (P. Rule 56.1 Stmt. ¶ 16; Seward Decl., Ex. 9.) IBM/LA moved its headquarters to Miami at about the same time. (D. Resp. to P. Rule 56.1 Stmt. ¶ 10; Torrico Tr. 94.) On February 2, 1999, Marcela Grisanti, a rheumatologist in Santiago, informed IBM in writing that Torrico suffered from fibromyalgia, reactive arthritis, hypertension, and a stress disorder. IBM continued Torrico's leave until March 1, 1999 (P. Rule 56.1 Stmt. ¶ 16), and Torrico continued to keep IBM apprised of his condition, as did his treating physicians, Brizzolara and Grisanti. (*Id.* ¶¶ 17–20; Seward Decl., Ex. 10.) By letter dated February 22, 1999, IBM requested that Brizzolara furnish information on Torrico's health, including a "diagnosis (all recent test[s] to support the di[a]gnosis), present status, [and] prognosis." (Seward Decl., Ex. 11.) Brizzolara responded to that letter on February 26 (P. Rule 56.1 Stmt. ¶ 18), and on March 2, Grisanti also sent a report on Torrico's condition to Dr. Linda Rock, the "Head of IBM['s] Medical Dept . . . . who supervised Mr. Torrico's medical leave on behalf of IBM Corp." (*Id.*, Ex. 12.) On March 8, Rock indicated in an internal memorandum her intent to identify a "native Chilean but [E]nglish-speaking MD in Santiago" who could conduct "an independent examination of Mr. Torrico" to determine his medical fitness to be flown to the United States, where IBM could have him evaluated by a specialist. (P. Rule 56.1 Stmt. ¶ 21.) Rock subsequently contacted Sergio Jacobelli, another Chilean physician, and requested that he medically evaluate Torrico for this purpose, which Jacobelli did on April 20. (*Id.* ¶¶ 22–23; 2d Torrico Decl. ¶ 6.)

When Torrico's international assignment ended on July 1, 1999 (P. Rule 56.1 Stmt. ¶ 30), he remained on a certified leave of

absence.[4] (Weiss Decl. ¶ 2.) IBM continued Torrico's leave, and he remained in Santiago under the care of his Chilean physicians, until late September 1999, at which time he flew to New York. (P. Rule 56.1 Stmt. ¶¶ 24–25.) There, two U.S. physicians, Carlos Reuda, a psychiatrist, and Paula J. Rackoff, a rheumatologist, examined Torrico in order to address the following issues:

(a) Diagnosis

(b) Degrees of disability, if any; i.e., is Mr. Torrico totally disabled, partially disabled, or not at all disabled?

(c) Adequacy and appropriateness of the treatment regimen currently employed.

(d) Prognosis for Mr. Torrico's return to work, here in the United States, with or without job limitations.

(*Id.* ¶¶ 25, 27.)

Torrico never received copies of the independent evaluations of Drs. Jacobelli and Rueda (2d Torrico Decl. ¶ 7), and IBM evidently did not disclose these reports, if they exist, in response to Torrico's discovery demands. (3d Seward Decl., Ex. 41 ¶¶ 3–4.) But in a letter to Rock dated October 5, 1999, Dr. Rackoff opined that Torrico suffers from "undifferentiated connective tissue disease ..., Sjogren's syndrome, [and] fibromyalgia." (Seward Decl., Ex. 18 at 2.) Based on her diagnosis, Dr. Rackoff deemed Torrico "partially disabled given the chronic pain from which he suffers," but she explained that certain medicines could afford him "mild to moderate relief." (*Id.*) She cautioned against returning Torrico "to a high stress job which would require frequent traveling" and deprive him of adequate sleep and exercise. (*Id.* 3.)

On November 2, 1999, Rock wrote to Khalil Barsoum, the IBM employee who acquired "direct management authority" over Torrico at the conclusion of his international assignment, and Richard Weiss, a human resources employee, documenting her discussion with Torrico and setting forth her conclusions based on receipt of independent medical evaluations. (P. Rule 56.1 Stmt. ¶¶ 30, 36; Seward Decl., Ex. 26.) Rock explained that in her view:

1. Mr. Torrico may be returned to work immediately, initially on a half-day schedule. After a period of 4 weeks, Mr. Torrico should resume working a full schedule.

2. Mr. Torrico should not be required, initially, to embark on flights of greater than three hours; further, until our investigation is completed, Mr. Torrico should refrain from flying on airlines which engage in the use of pesticides on board prior to flight.

3. There are no medical reasons which mitigate against Mr. Torrico's working at any location within the United States to which his organization should assign him.

(Seward Decl., Ex. 26 at 0507.) The next day, Weiss wrote to another member of IBM's human resources department, acknowledging that Torrico had been cleared to resume work and seeking guidance as to IBM's obligations concerning finding Torrico a new position in the United States. (*Id.*, Ex. 27.) Weiss also wrote to IBM's Executive Compensation Programs division, expressing concern that he did not have an appropriate job to offer Torrico. (*Id.*, Ex. 28.) Two days later, Weiss wrote to Torrico about several administrative issues arising from Torrico's extended leave. Weiss explained to Torrico that while Torrico had "indicated that Peter [Rowley] had committed to [Torrico], in writing, that

---

4. IBM's "Sickness and Accident Plan" gave Torrico the right to remain on medical leave, if necessary, for a period of as many as fifty-two weeks. (Weiss Decl. ¶ 2.)

[Torrico] would come back to a job in the United States at the same level or perhaps even higher," Weiss had spoken with Rowley, who disclaimed knowledge of any such obligation. (*Id.*, Ex. 29.)

In an e-mail to Barsoum dated November 10, 1999, Weiss reiterated the conditions under which Torrico could return to work, and he set forth several "talking points," including (1) that Rowley had not promised to restore Torrico to a job at the same or a higher level, (2) that Torrico could be assigned to a "Band 10 job in the White Plains area," and (3) that IBM could give him "a maximum of 30 days to relocate to [the] Tri–State area." (Seward Decl., Ex. 30 at 0566). Barsoum replied, "ok, but what is the alternative solution? the package for him to leave?" (*Id.*) According to Weiss, by mid-December 1999, he became "concerned over the lack of progress by Mr. Torrico in finding a job," and he therefore e-mailed Torrico to explain "the situation." (Weiss Decl. ¶ 9.) In his e-mail Weiss gave Torrico thirty days to relocate to the United States and find a new position commensurate with his skills. (*Id.*, Ex. 5.) According to Weiss, this is the standard deadline to find a new position given to employees returning from assignments abroad without a pre-existing commitment from IBM. (Weiss Decl. ¶ 9.) The same day, however, after speaking with Torrico, Weiss extended the deadline by an additional two weeks, to January 31, 2000. (*Id.*)

Torrico was unable to locate a new position with IBM by that date. (P. Resp. to D. Rule 56.1 Stmt. ¶ 22.) IBM discharged Torrico on January 31, 2000. (P. Rule 56.1 Stmt. ¶ 42.) Torrico refused the severance package IBM offered him (Weiss Decl. ¶ 12), evidently because he would have been required by IBM to sign a release before accepting it. On September 26, 2000, he filed a complaint with Equal Opportunity Employment Commission ("EEOC") (D. Rule 56.1 Stmt. ¶ 26), and on February 2, 2001, brought this action.

## DISCUSSION

### I. Standard for Summary Judgment

Summary judgment must be granted where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" if it "might affect the outcome of the suit under the governing law"; an issue of fact is genuine where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). On a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party, and the Court must resolve all ambiguities and draw all reasonable inferences in its favor. *Id.* at 255, 106 S.Ct. 2505; *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir. 1995).

To defeat summary judgment, however, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[C]onclusory allegations or unsubstantiated assertions" will not suffice. *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998). Rather, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' ") (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

## II. *Preliminary Issues*

IBM raises three threshold, and in its view dispositive, issues: (1) that the NYHRL does not protect Torrico; (2) that he failed timely to file a charge with the EEOC, statutorily barring his federal claims; and (3) that Torrico does not qualify as an employee covered by the ADA.

### A. *Torrico's Status Under the NYHRL*

■ At the pleading stage, the Court held that Torrico had stated a claim for violation of the NYHRL because Torrico's complaint could be construed to allege "either that 'a discriminatory act was committed in New York or that a New York State resident was discriminated against.'" *Torrico*, 213 F.Supp.2d at 407, quoting *Iwankow v. Mobil Corp.*, 150 A.D.2d 272, 541 N.Y.S.2d 428, 429 (1st Dep't 1989). IBM urges the Court to reconsider its construction of the NYHRL, arguing that the Court erred, first, by equating "resident," as used in the statute, with "domiciliary," *see Torrico*, 213 F.Supp.2d at 407–09; and second, by adopting a "center of gravity" rather than an "interest" analysis to determine the locus of Torrico's employment. *See id.* at 403–04. (D.Br.10–14.) Neither argument affects the Court's prior conclusions; ultimately, whether the NYHRL protects Torrico remains an issue of fact for the jury.

■ The meaning of "resident" under the NYHRL need not be revisited because the evidence developed in discovery establishes that Torrico does not qualify as either a resident or a domiciliary of New York. Before he began working for IBM, Torrico resided in Virginia, where he paid state taxes, acquired a driver's license, registered his car, and owned a home. (D. Rule 56.1 Stmt. ¶¶ 2–3.) He commuted to New York for several months, but never relocated there. That IBM treated Torrico as a New York resident for tax purposes (P. Resp. to D. Rule 56.1 Stmt. ¶ 3), a fact that IBM in any event disputes (D. Resp. to P. Rule 56.1 Stmt. ¶ 10), cannot suffice to make Torrico a resident or, *a fortiori*, a domiciliary, for domicile requires "[r]esidence *in fact*, coupled with the intent to make the place of residence one's home." *Texas v. Florida*, 306 U.S. 398, 424, 59 S.Ct. 563, 83 L.Ed. 817 (1939) (emphasis added). Torrico never bought or rented a home or apartment in New York, and the only reason he considered relocating there was that IBM/LA formerly maintained its headquarters in Mt. Pleasant, New York. On June 31, 1999, when his assignment abroad ended, Torrico had no reason or intent to return to New York. Even if he expected that IBM/LA would assign him to a new position at that time, IBM/LA had by then moved its headquarters to Miami, Florida. (D. Resp. to P. Rule 56.1 Stmt. ¶ 9.) Because Torrico is not, and never has been, a resident or domiciliary of New York, the NYHRL does not protect him as a New York "resident," N.Y. Exec. L. § 298–a(1), however that term should properly be construed as a matter of New York law. *See Torrico*, 213 F.Supp.2d at 407–408.

As the Court previously held, however, Torrico may also qualify for protection under the NYHRL if IBM's discriminatory conduct took place in New York. *Id.* at 407. In this regard, IBM's argument that the Court erred in its prior opinion by applying a "center of gravity" rather than an "interest" analysis to determine the locus of Torrico's employment is doubly misplaced. First, as the Court noted in that opinion,

> Torrico's allegation that IBM's allegedly discriminatory conduct took place in New York–though insufficient, by itself, to support his ADA claim, as noted above–would be sufficient to support his NYHRL claim regardless of his place of

employment. Whether an employee who is not a New York resident falls within the scope of the NYHRL's protections depends not on the place of employment, as it would for the claim of a non-U.S. citizen under the ADA, but rather on where the alleged acts of discrimination took place.

*Id.* at 407 n. 11. IBM is a New York corporation, and the evidence supports Torrico's contention that IBM's alleged discriminatory acts–its refusal to accommodate Torrico's request for more time to seek a new position and its ultimate discharge of Torrico–were taken by IBM employees based in New York: Barsoum, Weiss, and perhaps others. Because a reasonable juror could infer that IBM's allegedly discriminatory conduct took place in New York, the Court cannot conclude as a matter of law that the NYHRL does not protect him.[5] *See Iwankow,* 541 N.Y.S.2d at 429.

Second, IBM mistakenly suggests that the Court adopted New York's "center of gravity" rule for purposes of the NYHRL analysis in *Torrico.* (D.Br.13–14.) The Court did not look to the "center of gravity" rule for choice-of-law purposes, that is, to determine which law, Chilean or New York, should apply to Torrico's anti-discrimination claims. Were that the question, IBM might be correct that New York choice-of-law principles require an "interest analysis" because the NYHRL seeks to regulate conduct rather than allocate loss.[6] *See Robins v. Max Mara,*

5. The cases that IBM cites for the proposition that "courts refuse to apply New York law to non-residents physically working outside of New York" (D.Br.13) establish that the NYHRL does not apply extraterritorially to acts of discrimination against a non-resident, where those acts occurred *outside* New York. *See, e.g., Caesar v. Interoute Telecomms., Inc.,* No. 00 Civ. 8629, 2001 WL 648946, at *3 (S.D.N.Y. June 12, 2001). But Torrico does not argue that the NYHRL applies extraterritorially to protect him. He claims that IBM's discriminatory conduct took place *within* New York. *See Torrico,* 213 F.Supp.2d at 407. The Court respectfully disagrees with *Lucas v. Pathfinder's Personnel, Inc.,* 2002 WL 986641 (S.D.N.Y. May 13, 2002), insofar as that case held that the allegation that a New York employer made a discriminatory decision in New York to discharge a non-resident employee cannot alone suffice to state a claim under the NYHRL unless that decision also had an actual impact in New York. *See id.* at *2. While the New York City Human Rights Law applies only to discriminatory acts that have an actual impact within the five boroughs, *see id.* at *1 (collecting cases), no New York authority suggests that the NYHRL is similarly limited. In *Iwankow,* upon which the Court relied in its prior opinion, *see Torrico,* 213 F.Supp.2d at 406–07, the First Department held that the plaintiff failed to state a claim because while he alleged that his discharge "was part of a world-wide reduction in force which was de-

cided upon at [the defendant's] corporate headquarters in New York," he "di[d] not allege that the decision to implement this reduction in an age-discriminatory manner originated at corporate headquarters." *Iwankow,* 541 N.Y.S.2d at 429. By contrast, Torrico claims that IBM's alleged *discriminatory* acts, its refusal to accommodate his need for more time to locate a new position with IBM and its ultimate discharge of Torrico, not merely IBM's general decision to downsize IBM/LA, took place in New York.

6. Even were the "interest analysis" choice-of-law principle relevant here, that principle would favor the application of New York rather than Chilean law. IBM cites several cases for the proposition that "the place where the plaintiff suffered the injury is the locus of the tort when the defendant's conduct occurs in one jurisdiction and the plaintiff's injuries are suffered in another." (D. Br. 14 n. 5.) As IBM acknowledges, however, New York no longer applies the traditional *lex loci delicti* rule to determine choice of law for cases that sound in tort (or analogous statutory causes of action); it instead "give[s] 'controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue in the litigation.' " *Cooney v. Osgood Mach., Inc.* 81 N.Y.2d 66, 72, 595 N.Y.S.2d 919, 612 N.E.2d 277 (1993), quoting *Babcock v. Jackson,* 12

*U.S.A., Inc.,* 923 F.Supp. 460, 465 (S.D.N.Y.1996) (applying the NYHRL rather than the New Jersey Law Against Discrimination where plaintiff, a New Jersey resident, alleged that his employer, a U.S. corporation headquartered in New York, allegedly discriminated against him in New York). But no one has suggested that Chilean law should apply to Torrico's claims. Under the NYHRL, his place of employment matters, if at all, only insofar as it may inform the question where the alleged acts of discrimination took place. *See Torrico,* 213 F.Supp.2d at 407 n. 11.

The Court discussed the "center of gravity" principle in the context of Torrico's ADA claim, which, unlike his NYHRL claim, cannot survive if he fails to establish his factual contention that IBM employed him in the United States, not abroad, within the meaning of the ADA. *See id.* at 403. The Court found that in analyzing *this* factual issue, "some guidance can be drawn from general employment law," in particular, to determine the "center of gravity" of Torrico's employment relationship with IBM for purposes of deciding whether IBM employed him in the United States or Chile. *Id.* Torrico's allegations sufficed to defeat IBM's motion to dismiss on this ground. Of course, IBM now argues that Torrico has failed to adduce evidence to substantiate those allegations, an argument the Court will address below. But even were Torrico found to have been employed by IBM in Chile for purposes of the ADA, he could still establish a violation of the NYHRL by proving that IBM's discriminatory acts took place in New York, and the evidence therefore suffices

to defeat IBM's summary judgment motion on this issue.

B. *The Timeliness of Torrico's EEOC Complaint*

▮▮ IBM also argues that Torrico's ADA claims should be dismissed because he failed timely to file a complaint with the EEOC. Ordinarily, an ADA plaintiff, like a plaintiff asserting claims under Title VII of the Civil Rights Act of 1964, must first timely file a complaint with the EEOC. *See* 42 U.S.C. § 12117(a) (incorporating the administrative prerequisites to a Title VII action); *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003); *see also Millage v. City of Sioux City,* 258 F.Supp.2d 976, 983 (N.D.Iowa 2003). Title 42 U.S.C. § 2000e–5(e)(1) establishes the period of limitations for filing an EEOC complaint:

> A charge ... shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred ..., except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice ..., such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred....

*Id.* "A claim is time-barred if it is not filed within these time limits." *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 109, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). Because "New York has an agency, the New York State Division of Human Rights ('NYSDHR'), with authority to grant or

---

N.Y.2d 473, 481, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963). Here, that jurisdiction, New York, happens to be the locus of the "tort," that is, the place where the alleged discriminatory acts occurred. Under an "interest analysis," the decisive fact would be

that New York has a far stronger interest than Chile in both the parties (a U.S. corporation and a U.S. permanent resident alien) and the issues (claims under federal and state anti-discrimination laws).

seek relief from unlawful employment practices," *Briggs v. N.Y. State Dep't of Transp.*, 233 F.Supp.2d 367, 374 (N.D.N.Y. 2002), "[i]ndividuals who first file a charges of discrimination with the NYSDHR may avail themselves of the longer three hundred day period within which they must file with the EEOC." *Id.*

It is undisputed that Torrico filed a charge with the EEOC on September 26, 2000, more than 180 but less than 300 days after IBM's alleged unlawful acts of discrimination.[7] (D. Br. 15; P. Opp. Br. 6–7.) It is also undisputed that Torrico did not himself initially file a charge with the NYSDHR. (D. Br. 15; P. Opp. Br. 8–9 & n. 6.) Torrico argues, however, relying on *Tewksbury v. Ottaway Newspapers*, 192 F.3d 322 (2d Cir.1999), that because the EEOC and the NYSDHR cooperate pursuant to a worksharing agreement, as a matter of law, his charge must be "deemed" filed with the NYSDHR on the same day he filed it with the EEOC, triggering the 300–day rule and thereby rendering his EEOC charge timely. (P. Opp. Br.7–9.) IBM, citing *Briggs*, 233 F.Supp.2d at 374, and *Kodengada v. Int'l Bus. Mach. Corp.*, 88 F.Supp.2d 236, 241 (S.D.N.Y.2000), both decided after *Tewksbury*, maintains that Torrico misconstrues that decision and cannot avail himself of the 300–day filing deadline. (D. Br. 15–16; D. Reply Br. 3–5.) Resolution of IBM's limitations argument thus requires clarification of the Second Circuit's holding in *Tewksbury*.

In *Tewksbury*, as here, the plaintiff filed a charge with the EEOC more than 180 but less than 300 days after the defendant employer's alleged discrimination. 192 F.3d at 325. Under a worksharing agreement between the NYSDHR and the EEOC, each agency had designated the other as its agent for purposes of receiving employment discrimination charges. *Id.* at 327. The EEOC therefore transmitted the plaintiff's charge to the NYSDHR shortly after its receipt of that charge and instituted proceedings with the NYSDHR on his behalf. *Tewksbury*, 192 F.3d at 325; *see Love v. Pullman Co.*, 404 U.S. 522, 525, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972) (holding that despite the literal terms of § 2000e–5(e)(1), which suggest that the "person aggrieved" must institute the proceedings with a state agency in order to trigger the 300–day deadline, the EEOC can institute such proceedings on behalf of an employment-discrimination plaintiff). The defendant in *Tewksbury* argued that even if the plaintiff effectively "instituted proceedings" with the NYSDHR by filing a charge with the EEOC, "he did not do so 'initially,' that is, before he filed with the EEOC." *Tewksbury*, 192 F.3d at 325; *see* 42 U.S.C. § 2000e–5(e)(1) (300–day deadline applies where claimant *"initially* instituted proceedings with [the appropriate] State or local agency") (emphasis added).

The Second Circuit began its analysis in *Tewksbury* by reviewing the Supreme Court's decision in *Mohasco Corp. v. Silver*, 447 U.S. 807, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980). There, the Court held that where the EEOC received a charge from the plaintiff 291 days after the alleged discriminatory conduct and immediately forwarded that charge to the NYSDHR, the EEOC "initially instituted

---

7. Torrico uses January 31, 2000, the date on which date IBM discharged him, as the relevant date from which to calculate his deadline for filing an EEOC complaint (P. Opp.Br.6–7), while IBM uses December 14, 1999, the date on which Weiss notified Torrico that he would be discharged if he failed to find a new position with IBM by January 31, 2000. (D.Br.15.) In either case, as the parties acknowledge, Torrico timely filed under the 300–day rule but not under the 180–day rule. (D. Br. 15; P. Opp. Br. 6–7.)

proceedings" with the NYSDHR on the claimant's behalf, rendering his charge timely under the 300–day rule. *See id.* at 816–17, 100 S.Ct. 2486. The Court reasoned that because "the EEOC could not proceed until either state proceedings had ended or 60 days had passed," *see* 42 U.S.C. § 2000e–5(c),[8] "the proceedings were initially instituted with [the NYSDHR] prior to their official institution with the EEOC." *Mohasco Corp.*, 447 U.S. at 816–17, 100 S.Ct. 2486 (internal quotation marks omitted). The Second Circuit noted that *Mohasco* did not control *Tewksbury* because under the worksharing agreement applicable in *Tewksbury*, the NYSDHR waived its right to the sixty-day exclusive jurisdiction period specifically to enable the EEOC immediately to process charges upon receipt, and under the federal regulations, "charges submitted to the EEOC are deemed filed with it on the date of receipt if the deferral-state agency has waived its right[ ] to the 60–day exclusive jurisdiction period." 192 F.3d at 326. In *Tewksbury*, that is, unlike in *Mohasco*, the worksharing agreement authorized the EEOC, notwithstanding § 2000e–5(c), to proceed immediately, hence "initially," before the relevant state agency's corresponding proceedings had terminated.

The Second Circuit found this to be a distinction without a difference. When a deferral-state agency waives its right to a sixty-day period of exclusive jurisdiction, that waiver terminates the agency's proceedings within the meaning of § 2000e–5(c). *See EEOC v. Commercial Office Prods., Co.*, 486 U.S. 107, 114–20, 108 S.Ct. 1666, 100 L.Ed.2d 96 (1988); *Ford v. Bernard Fineson Dev. Ctr.*, 81 F.3d 304, 309 (2d Cir.1996). Under the worksharing agreement in *Tewksbury*, when the EEOC received the plaintiff's charge, it was deemed to have "instituted proceedings" with the NYSDHR. *See also* 29 C.F.R. § 1626.10(c) ("Charges received by one agency under [a worksharing] agreement shall be deemed received by the other agency for purposes of [the timeliness of the charge]."). But under the same agreement, whereby the NYSDHR waived its sixty-day exclusive jurisdiction period, those proceedings terminated as soon as they began. *See Commercial Office Prods. Co.*, 486 U.S. at 115, 108 S.Ct. 1666; *Ford*, 81 F.3d at 309. "Thus, the NYSDHR proceeding on Tewksbury's ADA charge formally began and ended upon the EEOC's receipt of the charge but before Tewksbury's charge could be deemed as filed with the EEOC. The charge was, accordingly, 'initially' filed with the NYSDHR, not the EEOC." *Tewksbury*, 192 F.3d at 327; *see also EEOC v. Rotary Corp.*, 297 F.Supp.2d 643, 652–54 (N.D.N.Y.2003).[9] *Tewksbury* therefore held that if the EEOC and a deferral-state agency enter into a worksharing arrangement whereby each desig-

---

**8.** Section 2000e–5(c) provides in pertinent part that

[i]n the case of an alleged unlawful employment practice occurring in a State, or political subdivision of a State, which has a State or local law prohibiting the unlawful employment practice alleged and establishing or authorizing a State or local authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, no charge may be filed [with the EEOC] by the person aggrieved before the expiration of sixty days after proceedings have been commenced under the State or local law, unless such proceedings have been earlier terminated....

**9.** The West electronic database indicates that this decision emanated from the Southern District of New York. This appears to be an error. The opinion's author, Judge David N. Hurd, sits in the Northern District of New York, and the listed docket number in the Southern District refers to a different case.

nates the other as agent for purposes of receiving charges, "an administrative charge is subject to the 300–day limitations period, is timely filed, and is 'initially filed' with the deferral state-agency, even though it was actually filed first with the EEOC." *Millage,* 258 F.Supp.2d at 985 (so characterizing *Tewksbury's* holding)..

Between October 1, 1999, and September 30, 2000, the EEOC and the NYSDHR were cooperating pursuant to a worksharing agreement virtually, if not entirely, identical to the one at issue in *Tewksbury.* (2d Seward Decl., Ex. 38.) Each agency designate[d] the other as its agent for the purpose of receiving and drafting charges including those that are not jurisdictional with the agency that initially receives the charges. EEOC's receipt of charges on [NYSDHR's] behalf will automatically initiate the proceedings of both EEOC and the [NYSDHR] for the purposes of Section 706(c) and (e)(1) of Title VII [42 U.S.C. §§ 2000e–5(c) and 2000e–5(e)(1), respectively], including [the identical requirements of the] ADEA, EPA, and ADA.

(*Id.* § II(A).) Therefore, on September 26, 2000, when Torrico filed a charge with the EEOC, the EEOC automatically "instituted proceedings" with the NYSDHR. But because, under the same worksharing agreement, the NYSDHR also waived its right to a sixty-day exclusive jurisdiction period (*id.* § III(A)(1)), the NYSDHR proceedings terminated as soon as they began. *See Tewksbury,* 192 F.3d at 327. Consequently, "however paradoxical it may seem," *id.,* as a matter of law, Torrico "initially instituted proceedings," 42 U.S.C. § 2000e–5(e)(1), with the NYSDHR, thereby triggering application of the 300–day deadline for filing a charge with the EEOC.[10] Accordingly, Torrico timely filed his EEOC complaint on September 26, 2000, within 300 days after IBM's alleged unlawful discriminatory conduct.

IBM's objection that no evidence establishes that the EEOC *in fact* transmitted Torrico's complaint to the NYSDHR is unavailing, for under federal law, and as expressly provided in the worksharing agreement, one agency's receipt of a charge *automatically* initiates proceedings in both agencies for purposes of the timeliness of the charges. (2d Seward Decl., Ex. 38 § II(A).) 29 C.F.R. § 1626.10(c); *Tewksbury,* 192 F.3d at 327; *see also Laquaglia v. Rio Hotel & Casino, Inc.,* 186 F.3d 1172, 1176 (9th Cir.1999); *Rotary Corp.,* 297 F.Supp.2d at 654–55 (noting that some courts require "proof that a charge filed with the EEOC was actually transmitted to the deferral-state agency before dual-filing will be found," but concluding that dual filing should be presumed because the relevant worksharing agreement provided for it automatically, and under 29 C.F.R. § 1601.13(a)(3)(iii), which governs worksharing agreements, "dual filing is not an option–it is a requirement"); *cf. Ford,* 81 F.3d at 312 ("[T]he timeliness of a claimant's filing ... should not be made to depend upon whether one or the other agency follows through on its undertakings under a Worksharing Agree-

10. IBM urges the Court to construe *Tewksbury* otherwise based on two subsequent district court decisions, which, according to IBM, support its position. But neither of those decisions even discusses *Tewksbury* or the effect of worksharing agreements on the 42 U.S.C. § 2000e–5(e)(1) filing deadlines. *See Briggs,* 233 F.Supp.2d at 374; *Kodengada,* 88 F.Supp.2d at 241. Moreover, in *Rotary*

*Corp.,* 297 F.Supp.2d 643 Judge Hurd, the author of *Briggs,* thoroughly analyzed *Tewksbury* and other issues arising out of worksharing agreements, *see id.* at 651–659, in the context of facts relevantly similar to those here, and reached the same conclusion as does this Court as to the timeliness of the plaintiff's claim. *See id.* at 654–55.

ment."). Whether the EEOC physically or electronically transmitted Torrico's charge to the NYSDHR is therefore irrelevant; as a matter of law, its receipt of that charge "instituted proceedings" for purposes of § 2000e–5(e)(1).[11] Equally unavailing is IBM's objection that the NYSDHR lacked jurisdiction to consider Torrico's charge. (D.Br.16.) Because Torrico adequately alleged that IBM committed discriminatory acts in New York, *Torrico*, 213 F.Supp.2d at 407, the NYSDHR had subject matter jurisdiction to consider his allegations, even if, ultimately, the agency or a jury concludes that he failed to prove them.[12]

### C. Torrico's Status Under the ADA

■ The Court previously held that Torrico adequately alleged that IBM employed him in the United States within the meaning of the ADA because the "center of gravity" of his employment relationship with IBM remained in the United States notwithstanding his temporary assignment abroad. *Torrico*, 213 F.Supp.2d at 404. IBM urges the Court to reconsider its analysis and hold that Torrico's long-term temporary assignment to Chile renders him ineligible for coverage under the ADA because his claims concern "employment in a foreign country," 42 U.S.C. § 12111(4), and the ADA does not apply extraterritorially to non-citizens employed abroad. *See Torrico*, 213 F.Supp.2d at 399. The Court considered and rejected this argument in its earlier opinion on the ground that the

locus of Torrico's employment for purposes of the ADA could not be determined merely by noting that Torrico spent most of his work time in Chile in the years culminating in his alleged discriminatory discharge, *id.* at 403; rather, a variety of factors must be considered to ascertain the "center of gravity" of Torrico's "entire employment *relationship*" with IBM. *Id.* (emphasis in original) In *Torrico*, the Court set forth its analysis of this issue in detail, *see id.* at 400–05, and that analysis need not be repeated here except to clarify one point of evident confusion.·

The gravamen of IBM's objection to the Court's prior ruling is that the "center of gravity" approach, which courts commonly employ for choice-of-law purposes in the context of breach of employment contract claims, *see id.* at 403, has no place in the context of actions based on claims of discrimination, which resembles a tort more than a breach of contract. (D. Br. 13–14, 16–17 & n. 6.) Again, IBM misconstrues the role that the "center of gravity" test played in the analysis in *Torrico*. It did not figure in that analysis as a choice-of-law principle; neither party had raised any choice-of-law issue. Torrico brought claims under the ADA, a federal statute. Neither party argued then, or argues now, that any law *but* federal applies to those claims. The question, then and now, is whether Torrico's claims concern employment in the United States within the meaning of the statute, in which case he

---

**11.** The contrary holding–that the 300–day rule only applies if the EEOC first institutes a charge by the act of physically or electronically transmitting it to the appropriate deferral-state agency–would be inconsistent with *Tewksbury*, which holds that under worksharing agreements whereby the EEOC and a deferral-state agency designate one another as agent, the state agency's proceedings begin and end immediately upon the EEOC's re-

ceipt of the charge. *Tewksbury,* 192 F.3d at 327.

**12.** In *Dezaio v. Port Auth. of N.Y. and N.J.,* 205 F.3d 62 (2d Cir.2000), cited by IBM, the NYSDHR lacked subject matter jurisdiction because of the special status of the Port Authority of New York and New Jersey, which, under the governing bi-state compact, cannot be subjected to the NYSDHR's jurisdiction. *See id.* at 65.

may avail himself of the ADA, or employment in a foreign country, in which case he may not. *See Torrico*, 213 F.Supp.2d at 400–401. Because none of the cases cited by IBM in its motion to dismiss "involve[d] temporary, fixed-term assignments from an existing, U.S.-based position like the Temporary Assignment at issue in this case," *id.* at 402, the Court held in *Torrico*, as a matter of first impression, that to determine Torrico's place of employment for purposes of the ADA, consideration should be given to the factors relevant to determining the "center of gravity" of an employment relationship for purposes of choice-of-law issues. *See id.* at 403–404.

 IBM cites two decisions that purportedly conflict with this holding. In *Shekoyan v. Sibley International Corp.*, 217 F.Supp.2d 59 (D.D.C.2002), the facts of which IBM characterizes as "indistinguishable from Torrico's circumstances" (D.Br.17), the defendant employer recruited, trained, interviewed, and hired the plaintiff, a resident alien, in the United States for a job in the Republic of Georgia. The court held Georgia to be the locus of his employment for purposes of Title VII. *Id.* at 67–68. By contrast, Torrico claims, and a reasonable jury could find, IBM

hired him to work *in* New York, where he did in fact work for several months, and then sent him to Chile temporarily. But throughout, Torrico claims, and a reasonable jury could find, both he and IBM contemplated that at the conclusion of his assignment he would be reassigned to another U.S. position. *Shekoyan* is therefore not materially different from the cases cited by IBM at the pleading stage and distinguished on similar grounds. *See Torrico*, 213 F.Supp.2d at 401–02. In *Mota v. University of Texas Houston Health Science Center*, 261 F.3d 512 (5th Cir.2001), the Fifth Circuit ruled that it did not need to decide whether the plaintiff, a resident alien, could bring suit based on alleged incidents of sexual harassment that happened during his attendance at a three-day conference in Mexico, because the plaintiff's hostile work-environment claim also found support in allegations regarding incidents in a variety of locations in the United States.[13] *Id.* at 524 & n. 34. Contrary to IBM's suggestion, nothing in that decision "expressly rejects the business trip analogy this Court used." (D.Br.17.) Accordingly, the Court adheres to its earlier holding.[14]

---

**13.** The Fifth Circuit in any event mistakenly treated the question whether Title VII extends to events occurring in Mexico as one of subject matter jurisdiction. *See Mota*, 261 F.3d at 524 ("Assuming *arguendo* the validity of Mota's Title VII interpretation, subject matter jurisdiction would not be present if the events in Mexico were the sole basis for Mota's harassment claim.") As this Court emphasized in *Torrico*, the extraterritorial reach of a statute "has nothing to do with the jurisdiction of the courts. It is a question of substantive law turning on whether ... Congress asserted regulatory power over the challenged conduct." 213 F.Supp.2d at 396, quoting *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 813, 113 S.Ct. 2891, 125 L.Ed.2d 612 (Scalia, J., dissenting in part).

**14.** IBM also argues that considerations of policy should lead the Court to reconsider its holding. The Court's "center of gravity" approach to determining the locus of an ADA plaintiff's employment, according to IBM, "produces uncertainty and undesirable consequences," for it will "subject[ ] the determination concerning an employee's status to a non-exhaustive list of factors and the highly unpredictable 'totality of the circumstances' evaluation." (D.Br.17–18.) Even if the Court found these policy arguments persuasive, which it does not, they are irrelevant, for the Court has no license to redefine the meaning of "employment in a foreign country" under the ADA based on its own appraisal of competing policy goals. Congress established that the ADA applies to non-citizens as well as citizens employed in the United States, but not to non-citizens employed abroad. *See*

Under the ADA, the locus of employment of a resident alien temporarily deployed abroad depends on

a variety of factors, including (but not limited to) whether any employment relationship had, in fact, been created at the time of the alleged discrimination, and if so, where that employment relationship was created and the terms of employment were negotiated; the intent of the parties concerning the place of employment; the actual or contemplated duties, benefits, and reporting relationships for the position at issue; the particular locations in which the plaintiff performed those employment duties and received those benefits; the relative duration of the employee's assignments in various locations; the parties' domiciles; and the place where the allegedly discriminatory conduct took place.

*Torrico,* 213 F.Supp.2d at 403–04. Applying this analysis to the evidence presently before the Court, IBM's summary judgment motion fails.

IBM contends that, with discovery now complete, it cannot be disputed that IBM did not temporarily deploy Torrico to Chile, but rather moved his job there permanently and then eliminated it. (D. Br. 1, 18; D. Reply Br. 2.) That is not at all clear from the evidence. Construing the facts in the light most favorable to Torrico: Torrico and IBM, a U.S. corporation, formed their employment relationship in the United States, where Torrico worked for about ten months prior to being assigned temporarily to Chile. IBM treated Torrico as a U.S. employee in terms of his salary and benefits, including by providing him stock options available *only* to U.S. executive employees. It withheld U.S. federal and state taxes from his salary. Torrico reported to supervisors based in IBM/LA's New York office, and he returned to New York for meetings about once every two months. IBM emphasized to Torrico in writing the temporary nature of his assignment, cautioning him to bear this fact in mind when considering "personal or job-related commitments," for IBM would determine the length of his assignment, and IBM/LA would bear responsibility for planning Torrico's next position in the *United States.* (Seward Decl., Ex. 1.) IBM also represented in writing to the Department of Justice that Torrico would be reassigned to a new position in the United States at the conclusion of his assignment abroad. (*Id.,* Ex. 2.) And when Torrico's assignment abroad ended, both Torrico and IBM apparently expected that Torrico would find a new position in the United States. True, Torrico spent the vast majority of his time performing his employment duties abroad, but that factor alone is not decisive. *Torrico,* 213 F.Supp.2d at 403.

The Court therefore cannot say, as a matter of law, that the "center of gravity" of Torrico's employment relationship with

---

*Torrico,* 213 F.Supp.2d at 399. The phrase "with respect to employment in a foreign country," 42 U.S.C. § 12111(4), has a certain meaning. Clearly, as the Court explained in its prior opinion, a non-resident employed in the United States who travels abroad on a business trip is not stripped of the protections of the ADA the moment he or she leaves U.S. territory. *Torrico,* 213 F.Supp.2d at 402–03. That person remains employed in the United States notwithstanding his or her temporary travel abroad. The meaning of "employment in a foreign country" thus cannot depend solely on where a non-resident employee of a U.S. company happens to perform his or her duties, even if such a bright-line rule would facilitate the ability of companies to determine "whether a foreign national is covered by U.S. or local law." (D.Br.18.) Nor can the Court by fiat establish arbitrary lengths of time that separate a business trip from a short tour of overseas duty from permanent employment abroad.

IBM was in Chile rather than the United States. *See id.* ("[I]t is the 'center of gravity' of the entire employment *relationship* between [Torrico] and [IBM], rather than one or more locations where employment *duties* may have been performed that answers the factual question of whether an individual is 'employ[ed] in a foreign country' or in the United States within the meaning of the ADA.") (emphasis in original). IBM's motion for summary judgment on this ground is accordingly denied.

### III. *The Merits*

■ Both parties move for summary judgment on the merits of Torrico's claims. IBM argues that even if Torrico qualifies as disabled under the ADA and the NYHRL, a point that IBM does not dispute for purposes of its motion (D. Br. 19 n. 7), IBM did not discriminate against him on that basis, and in any event, the accommodations he demanded were unreasonable. (D.Br.19–23.) Torrico argues that he has established a prima facie case of disability discrimination under the ADA and that IBM has failed to come forward with a non-discriminatory reason to justify its treatment of him, entitling him to summary judgment on liability under the burden-shifting test set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–803, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The motions will be considered together, and both will be denied because a jury could find for either party on the present record.

### A. *The ADA*

■ To make out a prima facie case under the ADA, Torrico must establish (1) that IBM is subject to the ADA; (2) that he suffers from a disability within the meaning of the ADA; (3) that he is otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) that IBM took adverse employment action against him because of his disability. *See Giordano v. City of New York,* 274 F.3d 740, 747 (2d Cir.2001). IBM does not dispute that it is subject to the ADA, nor, for purposes of its motion, that Torrico qualifies as disabled within the meaning of the ADA. (D. Br. 19 n. 7.) Nor can it be disputed that IBM's discharge of Torrico, or its refusal to provide him more time to seek a new position with IBM before discharging him, constitutes adverse employment action. *See id.* at 747. The principal, if not sole, issue presented by these cross-motions is whether IBM discharged Torrico because of his disability rather than because of some nondiscriminatory reason.[15]

A reasonable juror could infer that IBM discharged Torrico, or failed to accommodate his request for additional time within which to find a new job with IBM, because of his disability.[16] Torrico's employment

---

**15.** IBM also argues that Torrico could not perform the "essential functions" of his job, with or without accommodation, because of his health condition, which, according to Torrico's deposition testimony, forced him periodically to need periods of rest during which he would be unable to work. (Torrico Tr. 267–68.) IBM asserts that it had no executive positions that could accommodate a person who required such periods of rest. (D.Br.22–23.) But Torrico contends that IBM discriminated against him by failing in good faith to try to find a suitable executive position for him, or to engage him in good-faith conversa-

tions about how to accommodate his disability (P. Br.15–16), and IBM does not explain, except in a conclusory fashion, what "essential functions" Torrico's disability disqualified him from performing.

**16.** IBM maintains that it had no obligation to provide Torrico a new position after his temporary assignment abroad ended, but only to afford Torrico the same "repatriation process" as non-disabled employees receive under IBM's "existing policies." (D.Br.20.) Whether IBM's internal memorandum to IBM/LA, which solicited its agreement to "re-

circumstances, as IBM acknowledges, were "unique." (D.Br.20.) While on certified sick leave from his position with IBM, Torrico's temporary assignment ended.[17] At that point, IBM asserts, Torrico "was functionally unemployed within the company and would have to find a position when the leave ended." (D. Rule 56.1 Stmt. ¶ 14.) In September 1999, when Torrico became medically fit to fly again, Rock, an IBM physician, asked two doctors in New York to evaluate Torrico specifically to determine his capacity to return to work. (P. Rule 56.1 Stmt. ¶¶ 25, 27.) And on November 2, 1999, Rock informed Barsoum that Torrico could be returned to work on a part-time basis. (Seward Decl., Ex. 26 at 0507.) Thereafter, Barsoum and Weiss discussed what to do about Torrico's employment situation. The e-mail exchange between them, while by no means conclusive, permits an inference of disability discrimination. Weiss e-mailed Barsoum certain "talking points," including that Barsoum should deny that IBM promised to restore Torrico to a position comparable to the one he left upon the conclusion of his temporary assignment and give Torrico thirty days to find a new job. (Seward Decl., Ex. 30 at 0566). Barsoum replied by inquiring under what conditions IBM could discharge Torrico. (*Id.*) Barsoum knew that Torrico's physicians had recommended that he be returned to work on a part-time basis and under low-stress conditions. A reasonable juror could infer that

Barsoum decided to discharge Torrico rather than face the potential difficulties associated with accommodating his disability.

Moreover, it is not clear why IBM declined to give Torrico extra time to locate a new job after he had been cleared to return to work by his physicians. Torrico's condition incapacitated him temporarily and compelled him to remain for several months in Chile, where he could not seek a new position with IBM. A juror could find that IBM's refusal to accommodate Torrico's request that Barsoum afford him a few extra months to find a new job with IBM was unreasonable and motivated by a discriminatory desire to discard a disabled employee rather than locate a suitable position for him. While Weiss testified that a thirty-day deadline is standard for employees returning from assignments abroad without a pre-existing commitments from IBM (Weiss Decl. ¶ 9), a juror could conclude either that Torrico *did* have a commitment from IBM or that it was in any event unreasonable for IBM to refuse to modify its usual thirty-day deadline to accommodate Torrico's unusual circumstances. Hence, the evidence, while not conclusive, suffices to create an issue of fact about IBM's real reason for discharging Torrico, and accordingly, IBM's motion for summary judgment on the merits of Torrico's ADA claims must be denied.

---

enter" Torrico upon the conclusion of his temporary assignment abroad "at no lower [a] level than the pre-assignment level" (Seward Decl., Ex. 3), constituted a binding commitment is an issue of fact properly left to the jury. But in any event, the issue is not whether IBM had the right to discharge Torrico under contractual arrangements it may have made with him. Even if it did, Torrico's discharge could furnish a basis for an ADA claim if IBM discharged Torrico because of his disability.

17. The evidence suggests that both IBM and Torrico contemplated that he would be reassigned or returned to work at a new position with IBM at that time. Only Torrico's health prevented him from flying back to the United States to seek or interview for a new position upon the conclusion of his assignment. IBM's suggestion that Torrico "did not return to the U.S., as requested by IBM, to find a new job" (D.Br.18) misleadingly implies that he deliberately chose not to cooperate with IBM. (P. Rule 56.1 Stmt. ¶ 11.)

At the same time, Torrico cannot prevail as a matter of law on the present record. IBM maintains that it discharged Torrico because "his prior position had been eliminated prior to his medical leave and he failed to find a new job within the time allotted to him to do so when he returned from his leave." (D.Opp.Br.3.) IBM offers affidavits from its employees, including Weiss, corroborating that assertion. A jury, not the Court, must decide whether to credit IBM's proffered reason and the testimony of its employees, for the Court "do[es] not sit to judge witness credibility on a motion for summary judgment." *Neidich v. Estate of Neidich,* 222 F.Supp.2d 357, 368 (S.D.N.Y. 2002). Moreover, while IBM does not itself seek summary judgment on this ground, it rightly points out that Torrico's evidence that he is disabled within the meaning of the ADA is not conclusive. *See Giordano,* 274 F.3d at 747–48 (discussing the definition of disability under the ADA). Based on Torrico's deposition testimony, and the opinions of his physicians, a jury could conclude that Torrico suffers from a disability that substantially limits one or more of his major life activities, *see* 42 U.S.C. § 12102(2)(A), but the evidence does not establish that proposition as a matter of law. *See Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867, 872 (2d Cir.1998) (noting that "the determination whether an impairment 'substantially limits' a major life activity is fact specific"); *see also Toyota Motor Mfg. v. Williams,* 534 U.S. 184, 196–97, 122 S.Ct. 681, 692, 151 L.Ed.2d 615 (2002) (determination whether an individual is disabled within the meaning of the ADA requires a case-by-case inquiry). Accordingly, Torrico's motion for summary judgment on liability under the ADA is denied.

### B. The NYHRL

The definition of a disability under the NYHRL is broader than under the ADA, *Reeves v. Johnson Controls World Servs.,* 140 F.3d 144, 154–55 (1998), but in other respects, the legal standards for appraising claims made under these statutes "are essentially the same." *Woolley v. Broadview Networks, Inc.,* No. 01 Civ. 2526, 2003 WL 554754, at *8 (S.D.N.Y. Feb.26, 2003). The evidence that defeats IBM's motion for summary judgment on Torrico's ADA claim equally suffices to defeat its motion on Torrico's NYHRL claim.[18]

### IV. Mitigation of Damages

Finally, IBM asks the Court to enter summary judgment limiting the potential scope of Torrico's damages because he allegedly failed to mitigate those damages by accepting a position with another com-

---

**18.** IBM argues that "the Court has no idea if [Torrico's Chilean] doctors followed medically accepted techniques and therefore cannot rely on their diagnoses for purposes of the NYHRL." (D.Opp.Br.7) Even assuming *arguendo* that the diagnoses of Torrico's Chilean treating physicians should not be considered for this reason, Dr. Rackoff, an American rheumatologist enlisted by IBM to evaluate Torrico, examined and tested Torrico independently, and she concluded that he suffers from "undifferentiated connective tissue disease ..., Sjogren's syndrome, [and] fibromyalgia." (Seward Decl., Ex. 18 at 2.) The Court has no reason to discredit this diagnosis and certainly cannot say as a matter of law that these conditions do not qualify as "demonstrable by medically accepted clinical or laboratory diagnostic techniques." N.Y. Exec. L. § 296(21). *See State Div. of Human Rights v. Xerox Corp.,* 65 N.Y.2d 213, 219, 491 N.Y.S.2d 106, 480 N.E.2d 695 (1985) ("Fairly read, the [NYHRL] covers a range of conditions varying in degree from those involving the loss of a bodily function to those which are merely diagnosable medical anomalies which impair bodily integrity and thus may lead to more serious conditions in the future.").

pany, Mercantil.com, in February 2000. (D.Br.23–25.) But Torrico testified that this offer had been "effectively withdrawn" (Torrico Tr. 46) after Mercantil.com learned of Torrico's medical history from IBM. Resolution of this issue is premature at this stage, and it is clear that the parties factually dispute the extent to which Torrico's acceptance of this job would have been feasible. Accordingly, IBM's motion for partial summary judgment limiting Torrico's damages is denied.

## CONCLUSION

For the reasons stated, the parties' cross-motions for summary judgment are denied. The parties shall appear before the Court for a pretrial conference on April 16, 2004, at 3:45 P.M.

SO ORDERED.